**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| U.S. TELEPACIFIC CORP., *et al.*,[1] | Case No. 26-90625 (ARP) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF STEVEN SHENKER IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Steven Shenker, pursuant to section 1746 of title 27 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director at Triple P TRS, LLC ("Portage Point"), a financial advisory services firm. Portage Point maintains its principal offices at 640 Fifth Avenue, 10th Floor, New York, New York 10019. Portage Point is the proposed restructuring advisor to the above-captioned debtors (collectively, the "Debtors," and collectively with their non-Debtor affiliates, the "Company"). On June 28, 2026, I was appointed as Chief Restructuring Officer of the Debtors.

2. I have over twelve (12) years of experience serving in a variety of roles, including in management positions, financial advisor, private equity investor, and investment banker. I joined Portage Point in June 2020 and have served as a Managing Director since January 2024. Prior to joining Portage Point, I held a variety of roles, including founding member and

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification numbers, are: U.S. TelePacific Holdings Corp. (0151); Mpower Holding Corporation (N/A); Mpower Communications Corp. (0042); TPx International Holdings Corp. (N/A); U.S. TelePacific Corp. (3876); NextWeb, Inc. (7530); DSCI, LLC (1304); OCiX, Inc. (2715); Arrival Communications, Inc. (2990); TPx Communications Co. (8824); Big City Networks, Inc. (N/A); and ICG ChoiceCom L.P. (N/A). The Debtors' service address is Plaza 7000 North Mopac Expressway, Suite 2080, Austin, TX 78731.

Vice President at private equity firm Periphas Capital, L.P., from 2018 to 2020; Associate at the Carlyle Group Inc. from 2016 to 2018; and Investment Banker at Moelis & Company LLC from 2014 to 2016. In 2014, I received a B.S. in Business & Management with a concentration in Finance from the Sy Syms School of Business at Yeshiva University

3. Portage Point has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases. I have personally been involved in recent comparable chapter 11 cases such as *In re Wag! Group Co.*, No. 25-11358 (TMH) (Bankr. D. Del. July 21, 2025), in which I served as a financial advisor to the debtors; *In re Blink Holdings, Inc.*, No. 24-11686 (JKS) (Bankr. D. Del. Aug. 12, 2024), where I served as Chief Restructuring Officer; *In re Center for Autism and Related Disorders, LLC*, No. 23-90709 (CML) (Bankr. S.D. Tex. June 12, 2023), where I served as Chief Restructuring Officer; *In re IEH Auto Parts Holdings LLC (Auto Plus)*, No. 23-90054 (CML) (Bankr. S.D. Tex. Jan. 31, 2023); *In re Teligent, Inc.*, No. 21-11332 (BLS) (Bankr. D. Del. Oct. 14, 2021), in which I served as a financial advisor to the debtors; *In re Bouchard Trans. Co., Inc.*, No. 20-34682 (DRJ) (Bankr. S.D. Tex. Oct. 22, 2020), where I served as Deputy Chief Restructuring Officer; and *In re Hornbeck Offshore Servs., Inc.*, No. 20-32679 (DRJ) (Bankr. S.D. Tex. May 19, 2020). I specialize in advising senior executives, boards of directors, and creditors in distressed situations.

4. In my capacity as Chief Restructuring Officer to the Debtors, I am familiar with and knowledgeable about the Debtors' day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of these chapter 11 cases (the "Chapter 11 Cases"). I have been responsible for leading Portage Point's engagement with the Debtors since October 28, 2025. The Debtors retained Portage Point to

provide advice and assistance in connection with the evaluation and implementation of strategic alternatives, as described in further detail below. Portage Point has worked with the Debtors on a variety of issues, including cash forecasting and liquidity management, financial forecasting, business plan development, and other contingency planning efforts. Since Portage Point's retention, I have worked closely with the Debtors' management team and other Advisors (as defined below). Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition, or from my discussions with the Debtors' management, professionals, attorneys, and advisors, including Sidley Austin LLP, as counsel ("Sidley") and PJT Partners LP, as investment banker ("PJT" and, together with Portage Point and Sidley, the "Advisors"). I believe, to the best of my knowledge, that the facts and circumstances set forth herein are true and correct. If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

5. On the date hereof (the "Petition Date"), the Debtors each commenced with the United States Bankruptcy Court for the Southern District of Texas (the "Court") a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). I submit this declaration (this "Declaration") to provide an overview of the Debtors, their businesses, and the Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions and other motions and applications that the Debtors have filed with the Court, including the "first-day pleadings" (the "First Day Pleadings"). I am authorized to submit this Declaration on behalf of the Debtors.

6. This Declaration is organized in five sections. Section I provides an overview of the Restructuring Transactions (as defined below). Section II provides background information on the Company's corporate history and operations. Section III offers an overview of the

Company's prepetition corporate and capital structure. Section IV describes the financial and operational circumstances resulting in the Debtors' prepetition restructuring efforts and, ultimately, the filing of these Chapter 11 Cases. Section V summarizes the relief requested in the First Day Pleadings.

## I. Overview

7. The Company is a national provider of managed IT services spanning connectivity and networking, cybersecurity, communications, and information technology infrastructure services to business customers across the United States. Through a recurring-revenue, services-based model, the Company delivers integrated technology solutions that enable small and mid-sized enterprises to operate secure, reliable, and scalable IT and network environments. The Company's solutions are mission-critical to their customers' daily operations, supporting network connectivity, voice and unified collaboration, and cybersecurity across thousands of business locations nationwide.

8. As described in greater detail in Section IV herein, previous out of court restructuring efforts, upcoming maturity dates and other material obligations preceded and prompted the Company to evaluate options with respect to its capital structure and go-forward liquidity. In 2022 and 2023, the Company and certain of its lenders, including lenders in the Ad Hoc Group (as defined herein), completed certain out of court restructuring transactions that provided new capital and extended certain then-existing debt maturities, most recently to May 2026, with the objective of creating runway to execute on the Company's business plan. Although the Company is operationally profitable, growth in recent years did not generate the level of cash flow required to service the Company's funded debt obligations while also maintaining the minimum liquidity necessary to operate its business. Consequently, in

early 2025, the Company began analyzing potential long-term solutions to its anticipated liquidity needs.

9. Beginning in March 2025, the Company engaged certain of the Advisors in earnest to commence discussions with an ad hoc group of certain of its existing first lien and third lien term loan lenders (the "Ad Hoc Group") and Tango Private Holdings II, LLC, the Company's sole direct equity holder (the "Consenting Investor"),[2] regarding potential strategic transactions. During the course of these discussions, the Company, recognizing that upcoming maturities and other material payments could result in insufficient liquidity and related credit agreement defaults, entered into forbearance agreements with the Ad Hoc Group and the Consenting Investor in October 2025 and January 2026 to extend runway for evaluating such strategic transactions. As described herein, the forbearances by the Ad Hoc Group and Consenting Investor, including regarding non-payment of interest owed under the First Lien Term Loan Facility (the "PIK Bridge"), provided critical liquidity to the Company which, together with the additional $20 million Superpriority Term Loan Facility provided by the Ad Hoc Group and the Consenting Investor, facilitated the Company's pursuit of a value maximizing path for all stakeholders and funded the Marketing and Sale Process (as defined below).

10. After assessing multiple potential paths—including refinancing, equitization, and sale transactions—the Company commenced these Chapter 11 Cases to consummate a dual-track restructuring process consisting of (a) a court-supervised continuation of the prepetition Marketing and Sale Process (as defined below) and consummation thereof and (b) a potential toggle to a recapitalization transaction with certain of the Company's existing lenders if the

[2] The Consenting Investor or an affiliate thereof also holds 100% of obligations outstanding under the Second Lien Term Loan Facility (as defined below), and holds a minority position in each of the Superpriority Term Loan Facility, the First Lien Term Loan Facility, and the Third Lien Term Loan Facility (each as defined below).

Marketing and Sale Process does not satisfy certain Minimum Bid Requirements (as defined below).

11. As such, these Restructuring Transactions (as defined below) and the Chapter 11 Cases are being pursued pursuant to a Restructuring Support Agreement (as defined below) with the support of (a) the Consenting Investor, (b) 100% of the Company's superpriority term loan lenders, approximately 98% of the Company's first lien lenders, (c) 100% of the Company's second lien lenders, (d) approximately 88% of the Company's third lien lenders, and (e) 100% of the Company's accounts receivable purchasers (collectively, the "Consenting Stakeholders"). Certain of such Consenting Stakeholders participated in the Company's initial restructuring efforts in 2022 and 2023 and most recently have supported the Company's latest restructuring efforts over the past year.

12. The Restructuring Transactions are intended to preserve liquidity, maintain uninterrupted operations, and implement a durable solution to right-size the Company's balance sheet to its operating profile. Accordingly, in early December 2025, the Company, with the assistance of PJT, launched a marketing and sale process for all or a portion of the Company's assets (the "Marketing and Sale Process"), which received significant interest from both strategic and institutional buyers. That Marketing and Sale Process is ongoing and will continue postpetition pursuant to bidding procedures that include minimum bid requirements (the "Minimum Bid Requirements"), establishing a threshold value that any actionable bid must meet or exceed.[3]

[3] The Debtors seek approval of such bidding procedures, amongst other relief requested related to the Sale Process, pursuant to the *Debtors' Emergency Motion for Entry of an Order (I)(A) Approving Bid Procedures and Authorizing Sale Transaction; (B) Authorizing Designation of Stalking Horse Bidder; (C) Scheduling Auction and Sale Hearing; (D) Approving Sale Notices; (E) Approving Assumption and Assignment Procedures; and (II) Granting Related Relief*, filed contemporaneously herewith.

13. In the event that the Marketing and Sale Process yields one or more actionable bids that satisfy the Minimum Bid Requirements, the Debtors intend to consummate a value-maximizing sale transaction with the highest or otherwise best bidder pursuant to section 363 of the Bankruptcy Code (the "Sale Transaction"). In the event that the Marketing and Sale Process does not result in such a bid, the Debtors will instead pursue a recapitalization transaction with certain of their existing lenders and the Consenting Investor pursuant to a chapter 11 plan of reorganization (the "Reorganization Transaction" and, collectively with the Sale Transaction, the "Restructuring Transactions").

14. Accordingly, the Company enters these Chapter 11 Cases with (a) commitments from participating lenders under the First Lien Term Loan Facility, including the Consenting Investor in its capacity as a lender under the First Lien Term Loan Facility, to provide a $73.5 million debtor-in-possession senior-secured priming facility, consisting of (i) $20 million new-money loans (such loans, the "New Money DIP Facility") and (ii) $53.5 million roll up loans (such loans, the "Roll-Up Facility" and together with the New Money DIP Facility (the "DIP Facility") and (b) support from the Consenting Stakeholders for the foregoing transactions as described further herein, including a commitment to vote in favor of the *Joint Chapter 11 Plan of U.S. TelePacific Corp. and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "Plan"), filed contemporaneously herewith.[4] Participation in the DIP Facility was offered on the same terms to all lenders under the First Lien Term Loan Facility and the Revolving Credit Facility and backstopped by certain members of the Ad Hoc Group.

15. Whether through the Sale Transaction or the Reorganization Transaction, the Company's proposed dual-track structure is designed to maximize and preserve value for the

[4] Unless otherwise stated, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan.

benefit of the Debtors' estates and their stakeholders by subjecting the Company's assets to a robust, market-tested process while ensuring, through the committed toggle to a lender-supported recapitalization, that the Company can consummate a value-maximizing transaction, de-lever its balance sheet, and continue operating as a going concern without interruption regardless of the outcome of the Marketing and Sale Process.

## II. The Company's History and Operations

### A. Corporate History

16. The Company is a national provider of managed connectivity and networking, unified communications, cybersecurity, and information technology services to business customers across the United States. The Company was founded in 1998 in California as TelePacific Communications, operating primarily as a Competitive Local Exchange Carrier ("CLEC") providing telecommunications connectivity services to small and mid-sized business customers in California. Over time, a combination of organic growth and strategic acquisitions enabled the Company to expand its service offerings and geographic footprint, evolving from a regional telecommunications provider into a nationwide managed services provider delivering a broad set of critical IT and communications services.

17. The Company first expanded beyond California through its acquisition of NextWeb in 2010, enabling it to provide additional broadband and enterprise connectivity services in Nevada as well as California. In 2011, the Company further expanded geographically through its acquisition of Tel West Communications, which established a presence in Texas and added thousands of small and mid-sized business customers in that market. The Company realized a significant milestone in its evolution in 2016 when it acquired DSCI, a managed services provider headquartered in Massachusetts. The DSCI acquisition expanded the Company's customer base in the northeastern United States and added unified communications

and managed IT capabilities that significantly broadened the Company's service offerings. Today, the Company supports customers in a wide range of industries including healthcare, financial services, legal, retail, manufacturing, education, government, and non-profit organizations, providing services to approximately 11,000 customers primarily operating across the fifty states. While the Company maintains historical concentrations of customers in markets where it originally operated—particularly California, Texas, and the Northeast—its managed services platform enables it to support distributed customers across virtually every region of the country.

18. The Company is headquartered in Austin, Texas and is supported by approximately 575 employees who work either on premises at the Company's office locations or remotely throughout the United States. In addition, the Company's business operations are supported by hundreds of independent contractors and approximately 50 employees who work for the Company's non-Debtor affiliate in Ireland, providing back office operational support primarily comprised of customer and IT-related support. An illustrative chart of the Company's corporate structure as of the Petition Date is attached hereto as **Exhibit A**.

### B. Business and Operations

19. The Company operates as a Managed IT Services Provider ("MSP") focused on delivering integrated technology solutions that enable businesses to design, deploy, and manage business-critical networking, cybersecurity, unified communications, and IT infrastructure through a single provider. The Company's service offerings are designed to help customers simplify complex technology environments, support distributed and hybrid workforces, and maintain secure and reliable network connectivity.

20. The Company's business is built around four core service categories: (a) managed connectivity and networking; (b) cybersecurity solutions; (c) unified communications; and

(d) managed infrastructure and IT services. Through this model, the Company delivers subscription-based services that are embedded in customers' day-to-day operations, generating recurring revenue streams across multiple service lines and supporting long-term business relationships.

*i. Managed Connectivity and Networking*

21. The Company's largest and most business-critical service portfolio is managed connectivity and networking services, which provide the underlying infrastructure that delivers business internet and networking to customers' offices that support business applications, employee devices, and cloud applications. These services include software-defined wide area networking ("SD-WAN"), dedicated internet access, Ethernet transport services, private networking solutions, and other enterprise-grade connectivity offerings. Through these solutions, the Company designs, deploys, and manages networks that link multiple customer locations, support work-from-home employees, and deliver secure access to cloud-based systems and business applications. The Company also provides ongoing monitoring, optimization, and troubleshooting of customer networks to ensure business uptime, consistent performance and reliability. As businesses increasingly rely on cloud computing and distributed workforces, the ability to deliver secure and resilient connectivity across geographically dispersed locations has become essential. Accordingly, managed networking services form a critical backbone of the Company's service platform and frequently serve as the foundational layer upon which the Company delivers its other managed services.

*ii. Cybersecurity Solutions*

22. The Company's cybersecurity services are designed to protect customer networks, systems, and data from increasingly sophisticated cyber threats. These services include Secure Access Service Edge ("SASE"), managed firewall and network security services, endpoint

protection, email and web security solutions, threat monitoring, and incident detection and response capabilities. The Company also provides security awareness training and related compliance support services to help customers address regulatory and data protection requirements applicable to their industries. These cybersecurity offerings are delivered as services that integrate with the Company's connectivity and IT management platforms, allowing the Company to monitor customer environments continuously and respond to potential threats in real time. As cyber risks become an increasingly critical concern for organizations of all sizes, cybersecurity has emerged as an essential component of the Company's portfolio and a key differentiator in its managed services offerings.

*iii. Unified Communications*

23. The Company provides cloud-based unified communications services that integrate voice, messaging, video, conferencing, and collaboration tools into a single platform accessible across devices and locations. These services typically include hosted Voice over Internet Protocol ("VoIP") telephony, video conferencing solutions, team collaboration applications, and cloud-based contact center functionality used by businesses to manage business interactions. The Company's unified communications offerings enable customers to replace traditional on-premises telephone systems with cloud-delivered communications platforms that support hybrid and remote work environments. By integrating multiple communication channels into a single managed service, the Company's service offerings enable customers to streamline internal collaboration and maintain consistent communications with employees, partners, and customers regardless of physical location. The Company also provides business critical call center and contact center capabilities used by its clients to offer multi-modal sales, support, and service via phone, SMS, and chat. Because reliable communications infrastructure is mission-critical for most businesses, unified communications services represent a foundational

component of the Company's product portfolio and form a key driver of long-term customer relationships.

*iv. Managed Infrastructure and IT Services*

24. The Company also provides a broad range of managed IT services designed to support and maintain customers' core technology environments. These services commonly include monitoring and management of critical internet and network infrastructure, server and endpoint management, device lifecycle management, cloud migration and management services, backup and disaster recovery solutions, and remote help desk support. The Company also assists customers with the deployment and ongoing administration of widely used productivity platforms such as Microsoft 365 and other cloud-based enterprise applications. For many customers—particularly small and mid-sized enterprises that lack the resources to maintain dedicated internal IT staff—the Company functions as an outsourced IT department responsible for managing day-to-day technology operations and keeping critical business functions running. By providing proactive monitoring, technical support, and system administration services, the Company enables customers to focus on their core businesses while ensuring that their IT infrastructure remains secure, reliable, and operational. These managed IT services are central to the Company's strategy of delivering fully integrated technology management solutions rather than standalone communications services.

25. Together, these four service categories form an integrated platform that enables the Company to provide end-to-end technology management for its customers. By combining networking, cybersecurity, communications, and IT infrastructure management into a unified managed services model, the Company seeks to simplify complex technology environments for its customers while generating stable, recurring revenue streams across its core product offerings.

## III. The Company's Prepetition Capital Structure

26. As of the Petition Date, the Debtors have approximately $1.1 billion in total funded debt obligations as set forth below:

| Funded Debt | Maturity | Approximate Amount Outstanding[5] as of June 28, 2026 |
|---|---|---|
| **Superpriority Term Loan Facility** | July 2026 | $22 million |
| **First Lien Term Loan Facility** | May 2026[6] | $421 million |
| **Revolving Credit Facility** | Nov 2025[7] | $5 million |
| **Second Lien Term Loan Facility** | Nov 2026 | $658 million |
| **Third Lien Term Loan Facility** | May 2027 | $33 million |
| | **Total Funded Debt:** | **$1.1 billion** |

*i. Capital Structure Overview*

27. The Company's existing capital structure developed through a series of financing and restructuring transactions undertaken prior to the commencement of these Chapter 11 Cases. In February 2022, the Company announced the receipt of a $70 million growth equity investment, led by Siris Capital Group, LLC (the "2022 Transaction"). The 2022 Transaction was intended to support the Company's growth strategy and technology transformation, including investments in technology infrastructure, customer experience, service excellence, digital capabilities, and channel partner capabilities. In connection with the 2022 Transaction, the Company also refinanced its senior debt obligations on more favorable terms, including a multi-year extension of maturities.

28. Although the 2022 Transaction provided incremental capital and extended the Company's liquidity runway, the Company's business remained subject to significant funded

[5] Amount outstanding includes all principal amounts outstanding plus accrued PIK and unpaid cash interest.

[6] As further described below, the Debtors entered into certain forbearance agreements whereby the lenders thereto agreed to forbear from taking certain actions related to certain events of default, including the maturity of such facilities.

[7] Notwithstanding the November 2025 maturity, amounts owed under the Revolving Credit Facility remain outstanding as of the date hereof.

debt obligations. Accordingly, in 2023, the Company and certain of its lenders, including lenders in the Ad Hoc Group, completed a further out-of-court restructuring transaction designed to provide additional runway and operational flexibility by providing new capital and extending certain funded debt maturities to 2026 and 2027 (the "2023 Restructuring Transactions" and, together with the 2022 Transaction, the "Initial Restructuring Transactions"). Prior to the 2023 Restructuring Transactions, the Company's funded debt consisted primarily of a first lien credit agreement whereby the lenders party thereto provided (i) a term loan facility, in an initial aggregate principal amount of approximately $580 million and (ii) a revolving credit facility, in an initial aggregate principal amount of approximately $25 million (the "Prior First Lien Credit Facility"). Pursuant to the 2023 Restructuring Transactions, the Company refinanced the Prior First Lien Credit Facility through an offering to participating lenders to up-tier 50% of current first lien holdings into a new, super-senior first lien facility (the now-operative First Lien Term Loan Facility (as further described and defined below)). The remaining 50% of existing first lien holdings were purchased by the Consenting Investor at a discount, which holdings were then subordinated to the participating lenders, resulting in the now-current Second Lien Term Loan Facility (as further described and defined below). The Second Lien Term Loan Facility also included an approximately $65 million new capital infusion from the Consenting Investor upon the close of the 2023 Restructuring Transactions. Participating lenders also received additional consideration through the now-current Third Lien Term Loan Facility (as further described and defined below), which amounts equaled approximately 5.0% of such lenders' holdings under the Prior First Lien Credit Facility. As described below, one lender did not participate in the 2023 Restructuring Transactions, and such lender's holdings remain outstanding in a stub position under a stub Revolving Credit Facility (as defined below).

29. In addition to the above-referenced facilities, in connection with the Marketing and Sale Process and broader discussions regarding the Restructuring Transactions throughout 2025 and 2026, the Company and its Advisors engaged in negotiations with the Ad Hoc Group and the Consenting Investor regarding the terms of an additional bridge financing transaction. These discussions resulted in the Superpriority Term Loan Facility (as described and defined below), without which the Company would not have had sufficient funds to meet certain operational expenses or complete the Marketing and Sale Process.

*ii. Superpriority Term Loan Facility*

30. Certain of the Debtors are party to that certain *Superpriority Credit Agreement*, dated as of March 18, 2026 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Superpriority Credit Agreement"), by and among U.S. TelePacific Corp., as borrower, U.S. TelePacific Holdings Corp. ("TPx Holdings"), as parent guarantor, the subsidiary guarantors party thereto, the lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, which provides for, subject to the terms and conditions set forth therein, an initial commitment of up to a $20 million delayed draw term loan facility (the "Superpriority Term Loan Facility"). The Superpriority Term Loan Facility is secured by liens on substantially all of the assets of the Debtors. As of the Petition Date, approximately $22 million is outstanding under the Superpriority Term Loan Facility.[8]

*iii. First Lien Term Loan Facility*

31. Certain of the Debtors are party to that certain *First Lien Senior Secured Credit Agreement*, dated as of June 1, 2023 (as amended, restated, amended and restated, supplemented,

[8] The Superpriority Term Loan Facility includes a 1.75x multiple on invested capital ("MOIC"), which is not included in the estimated balance as of the Petition Date as shown herein.

or otherwise modified from time to time, the "First Lien Senior Secured Credit Agreement"), by and among U.S. TelePacific Corp., as borrower, TPx Holdings, as parent guarantor, the subsidiary guarantors party thereto, the lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, which provides for, subject to the terms and conditions set forth therein, an initial commitment of up to an approximately $332 million delayed draw term loan facility (the "First Lien Term Loan Facility"). The First Lien Term Loan Facility is secured by liens on substantially all of the assets of the Debtors. As of the Petition Date, approximately $421 million is outstanding under the First Lien Term Loan Facility.

*iv. Revolving Credit Facility*

32. Certain of the Debtors are party to that certain *Credit Agreement* dated as of February 15, 2022, as amended by that certain *Amendment No. 1 to Credit Agreement* dated as of June 1, 2024 (as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Revolving Credit Agreement"), by and among U.S. TelePacific Corp., as borrower, TPx Holdings, as parent guarantor, the lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, which, as a consequence of the 2023 Restructuring Transactions, provides for, subject to the terms and conditions set forth therein, up to a $5 million revolving credit facility (the "Revolving Credit Facility"). Prior to the 2023 Restructuring Transactions, the Company's capital structure consisted primarily of the Prior First Lien Credit Facility. As described above, the lenders who did not participate in the 2023 Restructuring Transactions, and consequently did not convert their existing term loan holdings to debt under the First Lien Term Loan Facility, retained the remaining outstanding portion of revolving loans issued in connection with the Prior First Lien Credit Facility pursuant to the Revolving Credit Agreement. The Revolving Credit Facility is

secured by liens on substantially all of the assets of the Debtors. As of the Petition Date, notwithstanding the Revolver Maturity (as defined below), approximately $5 million is outstanding under the Revolving Credit Facility.

*v. Second Lien Term Loan Facility*

33. Certain of the Debtors are party to that certain *Second Lien Senior Secured Credit Agreement* dated as of June 1, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Second Lien Credit Agreement"), by and among U.S. TelePacific Corp., as borrower, TPx Holdings, as parent guarantor, the subsidiary guarantors party thereto, the lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, which provides for, subject to the terms and conditions set forth therein, an initial commitment of up to an approximately $397 million delayed draw term loan facility (the "Second Lien Term Loan Facility"). The Second Lien Term Loan Facility is secured by liens on substantially all of the assets of the Debtors. As of the Petition Date, approximately $658 million is outstanding under the Second Lien Term Loan Facility.

*vi. Third Lien Term Loan Facility*

34. Certain of the Debtors are party to that certain *Third Lien Senior Secured Credit Agreement* dated as of June 1, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Third Lien Credit Agreement"), by and among U.S. TelePacific Corp., as borrower, TPx Holdings, as parent guarantor, the subsidiary guarantors party thereto, the lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, which provides for, subject to the terms and conditions set forth therein, an initial commitment of up to an approximately $33 million delayed draw term loan facility (the "Third Lien Term Loan Facility"). The Third Lien Term Loan

Facility is secured by liens on substantially all of the assets of the Debtors. As of the Petition Date, approximately $33 million is outstanding under the Third Lien Term Loan Facility.[9]

## IV. Circumstances Leading to Commencement of These Chapter 11 Cases

### A. Post-Initial Restructuring Transactions and Operating Profile

35. As described above, pursuant to the Initial Restructuring Transactions, the Company gained additional runway and operational flexibility through the acquisition of new capital and the extension of certain funded debt maturities to 2026 and 2027. Since the Initial Restructuring Transactions, the Company has continued to operate as a going concern and has generated positive adjusted EBITDA; however, notwithstanding positive operational performance, the Company's revenue growth and overall scale have not increased to a level sufficient to service its funded debt obligations while simultaneously maintaining the minimum liquidity required to fund working capital, capital expenditures, lease obligations, and other ordinary course operating expenses.

### B. Proactive Evaluation of Capital Structure Needs

36. Entering 2025, the Company undertook a forward-looking review of its projected cash flows in light of its debt service requirements and minimum liquidity covenants, recognizing that the Company faced approximately $300 million of funded debt maturities in 2026, as well as ongoing cash interest obligations and other fixed payment commitments. The Company ultimately determined that, absent a material improvement in operating performance or a capital structure adjustment, the Company would be unable to both (a) meet its scheduled debt

[9] In addition, the Company has also funded ordinary course operations through the sale of certain accounts receivable pursuant to that certain (a) *Restated Receivables Purchase Agreement* dated as of February 11, 2020, by and among Parent and Tango Stockholder Holdings, LLC and (b) *Amended and Restated Receivables Purchase Agreement*, dated June 1, 2023 by and among Parent and Tango Private Investments, LLC (each as amended, supplemented, modified, extended, renewed, restated, or refunded from time to time, the "Receivables Purchase Agreements," the purchasers thereunder, the "RPA Purchasers," and the Company's obligations thereunder, the "RPA Obligations").

service obligations, and (b) maintain sufficient minimum liquidity to operate safely and in compliance with the requirements imposed by its debt documents.

37. Accordingly, these challenges were not a consequence of operational deficiencies, but rather an imbalance in the Company's capital structure given its operating revenue. As such, the Company began exploring potential strategic alternatives to identify the best path forward to address its capital structure and to complement the Company's growth potential.

### C. Prepetition Restructuring Efforts

#### *i. Exploration of Strategic Alternatives*

38. The Company engaged its Advisors in early 2025 and initiated discussions with the Ad Hoc Group and the Consenting Investor regarding potential transactions to align the Company's capital structure with its operating profile. Management and the Advisors evaluated a range of alternatives, including refinancing transactions, consensual equitization or liability management transactions, incremental capital raises, and a potential sale of the business. In parallel, the Company assessed several significant upcoming liquidity events—including the November 2025 maturity of the Revolving Credit Facility (the "Revolver Maturity"), a material fourth-quarter payment obligation pertaining to certain fiber leases no longer utilized by the Company (the "Fiber Lease"), and a substantial December 2025 cash interest payment under the First Lien Term Loan Facility (the "December Interest Payment"). The Company, in consultation with its Advisors and through negotiations with the Ad Hoc Group and Consenting Investor, determined that satisfying all such obligations in the ordinary course would significantly impair operating liquidity, risk credit agreement covenant breaches, and impact the Company's ongoing evaluation of strategic alternatives. Contemporaneously with this assessment, the Company determined that the Marketing and Sale Process would provide the

greatest opportunity to canvas the market to evaluate actionable transactions that could maximize the value of the Company's assets.

39. As such, to preserve liquidity and create a stable environment for negotiations regarding the terms of the Marketing and Sale Process, the Company negotiated a series of forbearance agreements with the Ad Hoc Group and the Consenting Investor—comprising lender supermajorities under the First Lien Term Loan Facility, the Second Lien Term Loan Facility, and the Third Lien Term Loan Facility. On October 31, 2025, the Company entered into forbearance agreements with the requisite lenders under each of the First Lien Senior Secured Credit Agreement, Second Lien Credit Agreement, and Third Lien Credit Agreement (collectively, the "Initial Forbearance Agreements"). Pursuant to the Initial Forbearance Agreements, the lenders party thereto agreed to forbear from exercising default-related rights and remedies arising from certain anticipated or existing events of default under applicable debt documents, primarily relating to the Company's failure or anticipated failure to make certain payments pursuant to the Revolver Maturity[10] and satisfy obligations in connection with the Fiber Lease, which in turn would trigger cross-default provisions under the Company's other secured credit facilities. The Initial Forbearance Agreements were intended to provide short-term relief sufficient for the Company and its lenders to agree on the terms of more fulsome forbearance agreements while negotiating additional parameters regarding the Marketing and Sale Process. During the course of these negotiations, the Company, the Ad Hoc Group, and the Consenting Investor subsequently amended the Initial Forbearance Agreements to include a

[10] Although the lenders under the Revolving Credit Facility are not party to the Initial Forbearance Agreements, such lenders are prohibited from exercising remedies pursuant to that certain *Pari Passu Intercreditor Agreement* dated as of June 1, 2023 (as amended, restated, amended and restated, or otherwise modified from time to time), among U.S. TelePacific Corp., the other grantors party thereto, Wilmington Savings Fund Society, FSB, as initial collateral agent and administrative agent, and each additional agent from time to time party thereto, absent the consent of the Required Lenders thereunder (as such term is used therein).

forbearance of default-related rights and remedies arising from certain additional anticipated defaults relating to the December Interest Payment, resulting in the PIK Bridge. As described herein, the PIK Bridge was necessary to fund the Company's ongoing review of strategic alternatives and to pursue the Marketing and Sale Process.

40. Following continued negotiations with the Ad Hoc Group and Consenting Investor, the Company subsequently entered into amended and restated forbearance agreements on January 6, 2026 (the "Amended Forbearance Agreements" and, together with the Initial Forbearance Agreements, the "Forbearance Agreements"). Among other things, the Amended Forbearance Agreements extended the lenders' agreement to forbear from exercising remedies with respect to the above specified events of default through the maturity of the First Lien Term Loan Facility.[11] Taken together, the Forbearance Agreements provided additional runway for the Company and its stakeholders to pursue the Marketing and Sale Process in connection with a broader restructuring transaction. The Amended Forbearance Agreements also contemplated a Restructuring Support Agreement by and among the Company, the Consenting Investor, and the Ad Hoc Group, which established a framework for a comprehensive restructuring process and was entered into by the parties thereto on January 6, 2026 (the "Initial Restructuring Support Agreement"). Accordingly, consistent with these lender negotiations, the Company formally launched the Marketing and Sale Process in early December 2025.

*ii. The Special Committee and Transaction Committee*

41. In connection with the Company's restructuring efforts, on September 30, 2025, TPx Holdings appointed James Gillis and Anthony Horton as independent directors (the "Initial

---

[11] The Amended Forbearance Agreements also included an agreement from the lenders party thereto to forbear from exercising remedies in connection with the nonpayment of March 2026 cash interest under the First Lien Term Loan Facility (the "March Interest Payment"). The amounts that would otherwise be due and owing on account of the December Interest Payment and the March Interest Payment, inclusive of any Default Interest owing on such amounts, comprise the Rolled PIK Bridge (as defined below).

Independent Directors") of its board of directors (the "Board"). On October 27, 2025, TPx Holdings established a special committee comprised of the Initial Independent Directors (the "Special Committee") to investigate whether the Company holds potentially valuable and viable claims or causes of action against related parties (the "Independent Investigation") and evaluate strategic alternatives. As of February 19, 2026, TPx Holdings, at the sole direction of the Special Committee, engaged Katten Muchin Rosenman LLP ("Katten") as independent counsel to assist in, among other things, conducting the Independent Investigation.

42. On January 6, 2026, TPx Holdings (a) appointed David Aloise and Lloyd Sprung (the "Subsequent Independent Directors") to the Board and (b) established a transaction committee comprised of the Initial Independent Directors and Subsequent Independent Directors (collectively, the "Independent Directors") to oversee the Marketing and Sale Process (the "Transaction Committee"). On April 24, 2026, TPx Holdings appointed the Subsequent Independent Directors as additional members of the Special Committee.

43. The Independent Investigation has been ongoing since February 2026 and remains ongoing as of the Petition Date. I understand the Special Committee anticipates concluding the Independent Investigation during the Chapter 11 Cases.

*iii. The Sale Process*

44. On December 4, 2025, the Company, with the assistance of PJT, launched the Marketing and Sale Process. Throughout the Marketing and Sale Process, PJT contacted 65 potential buyers, comprised of both strategic partners and financial sponsors, of which 33 signed non-disclosure agreements and received access to a virtual data room and reviewed due diligence. The management team, along with PJT, engaged in 26 diligence sessions and other transaction-related conversations, including 9 management presentations with potential buyers.

45. The Company, with the assistance of its Advisors, determined that the Marketing and Sale Process should be extended to further develop the potential bids and interest from potential bidders. Accordingly, as further described below, the Ad Hoc Group and the Consenting Investor provided the Superpriority Term Loan Facility to fund the continuation of the Marketing and Sale Process, as well as other operational expenses.

46. Following multiple rounds of engagement, the Company received 9 bids; however, the Company and its Advisors determined that none of such bids reflected terms that were sufficiently developed to proceed on an actionable basis at that time. In consultation with its Advisors and key stakeholders, the Company determined that continuing the prepetition Marketing and Sale Process in a court-supervised environment would maximize value and provide additional time and flexibility to solicit higher or otherwise better bids. Accordingly, the Company will continue its Marketing and Sale Process postpetition pursuant to bidding procedures to be approved by the Court, which will include the Minimum Bid Requirements. The Company believes that the postpetition Marketing and Sale Process will provide the best opportunity to consummate a value-maximizing Sale Transaction for the benefit of all stakeholders, or, alternatively, if no actionable bids are received, serve as a robust market test to inform the terms of any potential pivot to a Reorganization Transaction.

### D. Superpriority Term Loan Facility and Further Amendments to Forbearance Agreements

47. As described above, the Company and its Advisors began negotiating with the Ad Hoc Group and the Consenting Investor in early 2026 regarding the terms of a $20 million bridge financing transaction (before accounting for applicable fees and interest) pursuant to the

Superpriority Credit Agreement, which was consummated on March 18, 2026.[12] This Superpriority Term Loan Facility provided incremental liquidity and runway to conduct the Marketing and Sale Process and negotiate the Restructuring Transactions. As part of the same broader effort to provide runway for evaluation of strategic alternatives, the Company and the lenders party to the Forbearance Agreements, agreed to further amend the Forbearance Agreements to cover certain additional events of default relating to the maturity of the First Lien Term Loan Facility.

48. Together, the Forbearance Agreements and the Superpriority Term Loan Facility were intended to alleviate near-term liquidity constraints, defer imminent maturity pressures, and facilitate continued, constructive negotiations among the Company, the Ad Hoc Group, and the Consenting Investor regarding the Restructuring Transactions. These actions provided the Company with critical additional time and flexibility to advance the Marketing and Sale Process, evaluate potential transactions, and negotiate the Restructuring Transactions, including both a potential Sale Transaction and, if necessary, a Reorganization Transaction.

### E. The Restructuring Support Agreement, the Restructuring Transactions, and Commencement of the Chapter 11 Cases

49. As described above, over the past year-plus the Company and its Advisors have worked to evaluate all strategic options available and have built considerable consensus with the Ad Hoc Group and the Consenting Investor. These efforts culminated in (a) a commitment from certain of the Company's lenders to provide the DIP Facility; (b) alignment on a dual-track restructuring strategy designed to maximize value through either the Sale Transaction or the Reorganization Transaction; and (c) support from the Consenting Stakeholders for the

[12] The Company and certain of the Consenting Stakeholders also amended the Initial Restructuring Support Agreement on March 18, 2026 to reflect the terms of the bridge transaction pursuant to the Superpriority Credit Agreement (the "March 2026 Restructuring Support Agreement").

Restructuring Transactions, the Plan, and the commencement of these Chapter 11 Cases. Such support was memorialized pursuant to a further amendment of the March 2026 Restructuring Support Agreement dated June 28, 2026 and attached hereto as **Exhibit B** (the "Restructuring Support Agreement").

50. Pursuant to the Restructuring Support Agreement, the Consenting Stakeholders have agreed to, among other things, as applicable:

- vote to accept the Plan (subject to the terms and conditions set forth therein);
- support and provide releases as set forth in the Plan;
- refrain from taking any action that would delay or impede consummation of the Restructuring Transactions or Plan; and
- support and effectuate the Restructuring Transactions, including entry into the DIP Facility, contemplated by the Restructuring Support Agreement.

51. The Restructuring Support Agreement contemplates consummation of the Restructuring Transactions in accordance with the following key terms.

52. *First*, the Consenting Stakeholders support the Company's entry into the DIP Facility, that includes (a) the $20 million New Money DIP Facility and (b) the $53.5 million Roll-Up Facility, which is comprised of a roll-up of (i) $34.7 million of loans payable under the Superpriority Term Loan Facility (after accounting for the 1.75x MOIC) (the "Rolled Bridge Facility"); (ii) $13.8 million of unpaid cash interest under the First Lien Term Loan Facility (such amounts, the "Rolled PIK Bridge"); and (iii) $5 million of loans outstanding under the First Lien Term Loan Facility (such amounts in this clause (iii), the "Pari Rolled Debt").

53. *Second*, if a Sale Transaction is consummated:

- all outstanding obligations under the DIP Facility shall be paid in full in cash; and

- all remaining cash proceeds shall be distributed in accordance with the waterfall set forth in the Plan, subject to the funding of a Wind-Down (as defined in the Plan).

54. *Third*, if a Reorganization Transaction is consummated, the Debtors' capital structure would be reorganized in accordance with the following key terms, all as set forth in greater detail in the Plan:

- all outstanding obligations under the New Money DIP Facility will be converted on a dollar-for-dollar basis into obligations under a new 1L Exit Facility;
- all outstanding obligations under the Rolled Bridge Facility will either be (a) converted on a dollar-for-dollar basis into obligations under the 1L Exit Facility (if the holders thereof fund their pro rata portion of the New Money DIP Facility) or (b) paid in full in cash with proceeds derived from the Preferred Equity New Money Commitments;
- all outstanding obligations on account of the Rolled PIK Bridge will be either converted (a) on a dollar-for-dollar basis into obligations under the 1L Exit Facility or (b) into Tranche A Preferred Equity Interests (as applicable);
- all outstanding obligations on account of the Pari Rolled Debt will be converted on a dollar-for-dollar basis into obligations under the 1L Exit Facility;
- all remaining obligations on account of the First Lien Term Loan Facility and Revolving Credit Facility shall either (a) be converted into equity of a reorganized Company (subject to dilution as set forth in the Plan) or (b) receive a pro rata cash payment with proceeds derived from the Preferred Equity New Money Commitments;
- all outstanding obligations under the Second Lien Term Loan Facility will be converted into certain warrants exercisable for equity of the reorganized Company subject to the exercise limitations set forth in the Plan; and
- certain of the Consenting Stakeholders will enter into and provide the Preferred Equity New Money Commitments.[13]

[13] As set forth in the Plan, the Preferred Equity New Money Commitments are comprised of (a) a $51.6 million new-money commitment by certain of the Consenting Stakeholders (b) a $3.7 million commitment fee; (c) $9.3 million of obligations from the Rolled PIK Bridge (collectively, "Tranche A"); and (d) a contribution by the RPA Purchasers of $9.8 million of RPA Obligations back to the Company ("Tranche B").

55. In the event of the Reorganization Transaction, the resulting capital structure would substantially de-lever the Company's balance sheet by approximately $1 billion as set forth below.

| Current Capital Structure (Approximate Amounts Outstanding) | | Reorganized Capital Structure | |
|---|---|---|---|
| **Superpriority Term Loan Facility** | $22 million | **Exit 1L Term Loan** | $54 million |
| **First Lien Term Loan Facility** | $421 million | **Tranche A Preferred Equity Interests** | $65 million |
| **Revolving Credit Facility** | $5 million | **Tranche B Preferred Equity Interests** | $10 million |
| **Second Lien Term Loan Facility** | $658 million | | |
| **Third Lien Term Loan Facility** | $33 million | | |
| **Total** | **$1.1 billion** | **Total** | **$129 million** |

56. The Debtors are committed to pursuing the Restructuring Transactions embodied in the Restructuring Support Agreement and the Plan in accordance with the dual-track strategy described herein and emerging from these Chapter 11 Cases with a deleveraged balance sheet and the financial flexibility to continue providing their customers with reliable and uninterrupted services on a go-forward basis. The Debtors believe their dual-track approach maximizes value by preserving the opportunity to achieve a market-clearing transaction through a competitive and court-supervised Marketing and Sale Process, while ensuring a clear and executable path to deleveraging through the Reorganization Transaction in the absence of an executable Sale Transaction. These Restructuring Transactions will preserve and strengthen the going-concern value of the business, and maximize creditor recoveries, all while minimizing disruption to day-to-day operations. In short, the Debtors believe the Restructuring Transactions contemplated in the Restructuring Support Agreement and the Plan represent the best available path to a value-maximizing transaction for the Debtors and their estates.

## V. Evidentiary Summary for First Day Pleadings

57. Contemporaneously herewith, the Debtors have filed a number of pleadings seeking emergency relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and execute a swift and smooth restructuring. I have reviewed each of the First Day Pleadings and believe that the factual support set forth in each of the First Day Pleadings is correct and accurate to the best of my knowledge, information, and belief. The First Day Pleadings include the following:

**Administrative and Procedural Pleadings**

- "Automatic Stay Motion": *Debtors' Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and* Ipso Facto *Protections of the Bankruptcy Code; (II) Approving the Form and Manner of Notice; and (III) Granting Related Relief*
- "Bar Date Motion":[14] *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim; (II) Approving the Form and Manner for Filing Proofs of Claim; (III) Approving the Notice of Bar Dates; and (IV) Granting Related Relief*
- "Claims Agent Retention Application": *Emergency* Ex Parte *Application for Entry of an Order Authorizing the Retention and Employment of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent*
- "Creditor Matrix Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated List of 30 Largest Unsecured Creditors, (C) Redact Certain Personally Identifiable Information; (II) Approving the Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information; and (III) Granting Related Relief*
- "Joint Administration Motion": *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases; and (II) Granting Related Relief*
- "Notice of Designation as Complex Case": *Notice of Designation as Complex Chapter 11 Bankruptcy Case*
- "Request for Emergency Consideration": *Debtors' Request for Emergency Consideration of Certain "First Day" Matters*

[14] The Bar Date Motion, while filed on the Petition Date, will not be heard at the First Day Hearing.

- "Schedules and Statements Extension Motion": *Debtors' Emergency Motion for Entry of an Order (I) Extending Time for the Debtors to File (A) Schedules of Assets and Liabilities and Statements of Financial Affairs and (B) 2015.3 Reports; (II) Modifying the Requirements of Bankruptcy Local Rule 2015-3; and (III) Granting Related Relief*

**Operational Motions**

- "Cash Management Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records; (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions; and (III) Granting Related Relief*
- "Critical Vendors Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors; and (II) Granting Related Relief*
- "Customer Programs Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto; and (II) Granting Related Relief*
- "DIP Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Senior Secured Liens and Provide Claims With Superpriority Administrative Expense Status, and (D) Grant Adequate Protection to the Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief*
- "Employee Wages Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Employee Benefits and (B) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in the Ordinary Course; and (II) Granting Related Relief*
- "Insurance Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain the Surety Bond Program; and (II) Granting Related Relief*
- "Lease Rejection Motion":[15] *Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to (A) Reject Certain Executory Contracts and Unexpired Leases, and (B) Abandon Certain Personal Property in Connection Therewith; and (II) Granting Related Relief*

[15] The Lease Rejection Motion, while filed on the Petition Date, will not be heard at the First Day Hearing.

- "NOL Motion": *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of, and Declarations of Worthlessness With Respect to, Instruments Treated as Stock; and (II) Granting Related Relief*
- "Taxes Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees; and (II) Granting Related Relief*
- "Utilities Motion": *Debtors' Emergency Motion for Entry of an Order (I) (A) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (B) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, (C) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Service; and (II) Granting Related Relief*

58. I have consulted with the Debtors and the Debtors' other Advisors regarding the relief requested in the First Day Pleadings, and understand each of the First Day Pleadings and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each of the First Day Pleadings are true and accurate. Where applicable, a brief summary of the facts supporting the First Day Pleadings is set forth below. To the extent any contain additional facts, those facts are incorporated herein by reference. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to such terms in the relevant First Day Pleadings.

59. The operational motions seek authority to, among other things, honor employee-related wages and benefit obligations, ensure the continuation of the Debtors' cash management system, pay claims of certain critical vendors, and maintain other operations in the ordinary course of business. The operational motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." However, I believe, based on conversations with the Advisors and the

Debtors, that the Debtors urgently need the relief requested in the operational motions to continue operations uninterrupted during these cases, and that failure to grant the relief requested in any of the First Day Pleadings may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, I believe and am advised that emergency consideration of such motions is warranted.

60. I further believe that the relief requested in the First Day Pleadings is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximize value preservation during the pendency of these Chapter 11 Cases. Additionally, I believe that (1) the relief requested in each operational motion is critical; (2) unless the relief is granted, the Debtors risk the probability of harm, or, alternatively, loss of economic advantage to the estate which is disproportionate to the amount of the prepetition claim sought to be satisfied; and (3) there is no practical or legal alternative by which the Debtors can deal with the claimants sought to be paid other than by payment of the claim.

61. Accordingly, for the reasons set forth herein and in each respective First Day Pleading, I believe that the Court should grant the relief requested in each of the First Day Pleadings.

**A. Automatic Stay Motion**

62. Pursuant to the Automatic Stay Motion, the Debtors seek (i) to enforce the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code and (ii) approval of the related form and manner of notice.

63. As described further herein, the Debtors utilize both domestic and international vendors, and the Debtors rely upon those creditors in order to continue to provide the high level and diverse array of product offerings to their customers. In the ordinary course of business, the

Debtors rely on, and incur obligations to, suppliers of goods and/or services and other creditors, a large number of which are based outside the United States. Such creditors supply critical goods and services, which are necessary to preserve the value of the Debtors' business, inuring to the benefit of the Debtors' stakeholders and their estates. These goods and services are essential to the Debtors' business operations. Without continued support from their non-U.S. suppliers and other commercial counterparties, the Debtors would face severe interruptions to their daily operations.

64. Non-U.S. creditors operating in various other jurisdictions may be unfamiliar with chapter 11 processes, the scope of a debtor in possession's authority to operate its business, or the importance and implications of the automatic stay. Because certain of the Debtors' business operations may implicate the law of other jurisdictions, certain of the Debtors' non-U.S. creditors could attempt to seize assets located outside of the United States or take other actions violating the automatic stay.

65. The Debtors are party to certain agreements with non-U.S. counterparties who could attempt to take action against the Debtors or their property, such as terminating those agreements upon the commencement of these chapter 11 cases pursuant to *ipso facto* provisions. Based on my discussions with the Advisors, I understand such actions would violate sections 362 and 365 of the Bankruptcy Code. Similarly, governmental units outside the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, franchises, or other similar grants held by a chapter 11 debtor and required for the Debtors' ongoing business operations, which I understand would also violate section 525 of the Bankruptcy Code.

66. The Debtors seek the relief requested in the Automatic Stay Motion out of an abundance of caution and to assist them in most effectively informing non-U.S. creditors of the

broad protections offered by the Bankruptcy Code. Based on my discussions with the Advisors, I understand that the Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code but instead to affirm those rights. I therefore believe the relief requested in the Automatic Stay Motion is necessary to protect against improper actions taken by, and provide clarity for, non-U.S. parties in interest.

**B. Bar Date Motion**

67. Pursuant to the Bar Date Motion, the Debtors seek entry of an order (a) setting bar dates for filing proofs of claim, (b) approving the form and manner of filing proofs of claim, (c) approving the notice of bar dates, and (d) granting related relief.

68. The Debtors seek to establish (a) a general bar date of August 17, 2026 (the "General Bar Date"); (b) a governmental bar date of December 28, 2026 (the "Governmental Bar Date"); (c) an amended schedules bar date; and (d) a rejection damages bar date (collectively, the "Bar Dates").

69. The Debtors also seek: (a) approval of the form and manner for filing proofs of claim, including the requirement that certain holders of claims file a written proof of claim (a "Proof of Claim") and the proof of claim form annexed as Exhibit 1 to the Bar Date Order (the "Proof of Claim Form"); (b) approval of the form and manner of notice of the Bar Dates, substantially in the forms annexed as Exhibits 2 and 3 to the Bar Date Order; and (c) authorization for the Debtors, with the consent of the Ad Hoc Group, to extend the Bar Date for certain holders of claims by stipulation or otherwise where the Debtors, with the consent of the Ad Hoc Group, determine that such extension is in the best interest of the Debtors' estates.

70. I believe that, in order for the Debtors to reorganize effectively and efficiently, it is important that they understand the full scope of the claims being made against them. Setting the Bar Dates by which all proofs of claim need to be filed should allow the Debtors to have

certainty in terms of what needs to be funded and allows them to proceed confidently with their Restructuring Transactions. Given the timing of this case, I believe and am advised that the proposed Bar Dates timeline is sufficient and necessary. Further, based upon my discussions with the Advisors, I believe and am advised that the Proof of Claim Form and the form and manner of notice of the Bar Dates proposed by the Debtors is reasonable and appropriate to facilitate a swift and efficient process by which the Debtors will be made aware of claims against them.

71. I believe that implementation of the procedures and deadlines set forth in the Bar Date Motion is necessary and appropriate to give all parties the confidence they need to effectuate the Debtors' Restructuring Transactions. Accordingly, I believe the relief requested by the Bar Date Motion should be granted.

**C. Claims Agent Retention Application**

72. Pursuant to the Claims Agent Retention Application, the Debtors seek to appoint Kroll Restructuring Administration LLC. ("Kroll") as the claims, noticing, and solicitation agent for the Debtors in these Chapter 11 Cases.

73. As more fully described in the Claims Agent Retention Application, Kroll will, among other tasks, (i) serve as the noticing agent to mail notices to creditors, equity security holders, and other parties in interest, (ii) provide computerized claims, objection, solicitation, and balloting database services, and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these Chapter 11 Cases, pursuant to the terms and conditions set forth in the Engagement Letter (as defined in the Claims Agent Retention Application).

74. I believe that Kroll's rates are competitive and reasonable. I further believe that, based on its extensive experience serving as a claims, noticing, and solicitation agent in other

complex chapter 11 bankruptcy cases, Kroll has the expertise required for these Chapter 11 Cases. As set forth in the Claims Agent Retention Application, Kroll represents that it has reviewed the potential parties in interest in these Chapter 11 Cases and believes that neither Kroll, nor any of its professionals, has any materially adverse connection to the Debtors, their creditors, or other relevant parties.

75. The Debtors anticipate that there will be numerous parties to be noticed and that many of these parties will file claims. The appointment of Kroll as the claims and noticing agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed Plan, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks. In addition, by appointing Kroll as the claims and noticing agent in these Chapter 11 Cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing. Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

**D. Creditor Matrix Motion**

76. Pursuant to the Creditor Matrix Motion, the Debtors seek (a) authority to (i) file a consolidated creditor matrix, (ii) file a consolidated list of 30 largest unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, and (iii) redact certain personal identifying information and sensitive business information from the documents filed with the Court in these Chapter 11 Cases and (b) approval of the form and manner of notifying creditors of the commencement of these Chapter 11 Cases.

77. It is my understanding that section 521(a) of the Bankruptcy Code and Bankruptcy Rule 1007(a) requires each debtor to file a separate mailing matrix, each containing names and addresses of all creditors, including individuals, as well as a separate list of top

unsecured creditors for each debtor. Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors. Further, because a significant number of creditors may be shared among the Debtors, the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors, rather than file separate top 20 creditor lists for each Debtor. The Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and the possibility of duplicative service, as well as assist the efforts to communicate with these creditors.

78. The Debtors request authority to redact certain Personal Identifiable Information including (a) the home addresses of individual creditors, employees, directors, officers, and individual equity holders of the Debtors and (b) the names, addresses, and other Personal Identifiable Information of any natural person located in the United Kingdom or a member state of the European Economic Area. Such redaction is necessary because, respectively, (x) disclosure of home address information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking under 11 U.S.C. § 107(c)(1), and (y) disclosure of names, addresses, and other Personal Data risks violating the UK GDPR and EU GDPR, exposing the Debtors to potential civil liability and significant financial penalties. Without such relief, the Debtors (i) may be in violation of applicable data privacy law, thereby exposing them to severe monetary penalties that could threaten the Debtors' operations during this sensitive stage of their restructuring, (ii) would unnecessarily render individuals more susceptible to identity theft, and (iii) could jeopardize the safety of individual creditors, employees, directors, officers, or individual equity holders of the Debtors, who, unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by

publishing their home addresses without any advance notice or opportunity to opt out or take protective measures.

79. The Debtors propose to serve, through Kroll, a singular notice of commencement to all parties entitled to notice of commencement of these chapter 11 cases, to advise them of commencement of these chapter 11 cases and the section 341 meeting of creditors. Service of the Notice of Commencement on the Consolidated Creditor Matrix will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix, but also preserve judicial resources and prevent creditor confusion through the efficient service of critical information.

80. Based on the foregoing, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

### E. Joint Administration Motion

81. Pursuant to the Joint Administration Motion, the Debtors seek joint administration of the Debtors' chapter 11 cases for procedural purposes only.

82. Given the Debtors' affiliation with one another, joint administration of these Chapter 11 Cases would provide significant administrative convenience. Based on my discussions with the Advisors, I do not believe that joint administration would harm the substantive rights of any party in interest. Joint administration would avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders, thereby saving the Debtors considerable expense and resources. The Debtors' financial affairs and business operations are closely related. Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each Debtor and its respective estate. The Joint Administration

Motion requests only administrative, and not substantive, consolidation of the estates. Each creditor shall still file its claim against a particular estate. In fact, all creditors would benefit by the reduced costs that would result from the joint administration of the chapter 11 cases. The Court also would be relieved of the burden of entering duplicative orders and maintaining duplicative files. Finally, supervision of the administrative aspects of the chapter 11 cases by the U.S. Trustee would be simplified.

83. I therefore believe that joint administration is warranted and that consolidating these Chapter 11 Cases will assist the Debtors in preserving the value of the estate by avoiding duplicative expenses.

**F. Notice of Designation as Complex Case**

84. Pursuant to the *Notice of Designation as Complex Chapter 11 Bankruptcy Case* (the "Notice of Designation as Complex Case"), the Debtors seek to have these Chapter 11 Cases designated as complex chapter 11 cases.

85. The proposed counsel for the Debtors believe that these Chapter 11 Cases qualify as complex chapter 11 cases because (a) the Debtors have total debt of more than $10 million, and (b) there are more than 50 parties in interest in this case. For these reasons, based on my discussions with proposed counsel to the Debtors, I believe that designation of these Chapter 11 Cases as complex chapter 11 cases is appropriate and will contribute to the efficient administration of these cases.

**G. Request for Emergency Consideration**

86. Pursuant to the Request for Emergency Consideration, the Debtors request emergency consideration of the following motions: the Notice of Designation as Complex Case, Joint Administration Motion, Claims Agent Retention Application, Creditor Matrix Motion, Automatic Stay Motion, Taxes Motion, NOL Motion, Utilities Motion, Insurance Motion,

Critical Vendors Motion, Customer Programs Motion, Employee Wages Motion, Cash Management Motion, DIP Motion, Lease Rejection Motion, Schedules and Statements Extension Motion, Bid Procedures Motion, and Solicitation Procedures Motion (each as defined herein).

87. I believe that failure to approve the relief requested in these respective motions would cause immediate and irreparable harm to the Debtors and their ongoing operations. Further, I believe that based on the complexity of these Chapter 11 Cases and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

### H. Schedules and Statements Extension Motion

88. Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order (i) extending the deadline by which the Debtors must file (a) their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs to and including July 19, 2026, twenty-one (21) days from the Petition Date, and (b) their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in rule 2015.3 of the Bankruptcy Rules to and including July 19, 2026, twenty-one (21) days from the Petition Date, in each case without prejudice to the Debtors' right to request additional extensions of such deadline for cause shown; and (ii) modifying the requirements of Bankruptcy Local Rule 2015-3 to permit the Debtors to file the 2015-3 Reports on a six-month basis.

89. Completing the Schedules and Statements and 2015.3 Reports requires the Debtors to spend considerable time and effort to collect, review, and assemble copious amounts of information in addition to attending to the day-to-day demands of the chapter 11 process. Before the Petition Date, the Debtors focused primarily on preparing the necessary pleadings to commence these cases and engaging in negotiations with their lenders and other parties in

interest. Postpetition, the substantial amount of work entailed in completing the Schedules and Statements and 2015.3 Reports will be directly competing with the demands upon the Debtors to address critical matters during the initial postpetition period.

90. The Debtors, with the assistance of their professional advisors, have been and will continue working diligently and expeditiously to prepare the Schedules and Statements and 2015.3 Reports within the additional time requested. Based upon my discussions with the Advisors, I believe an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements and 2015.3 Reports in advance of any deadline for filing proofs of claim in these chapter 11 cases.

91. Requiring the Debtors to file the 2015.3 Reports monthly would create an unnecessary administrative burden for the Debtors' estates due to the amount of time and effort that would need to be expended producing such report—time and effort that would be better spent focusing on the Debtors' business operations, restructuring efforts, and transition into chapter 11.

92. Accordingly, I believe that extending the Schedules Deadline and the deadline for the Debtors to file their initial 2015.3 Reports to the date that is twenty-one (21) days following the Petition Date, i.e., through and including July 19, 2026, is in the best interests of the Debtors and their estates and will not harm the interests of creditors and other parties in interest.

### I. Cash Management Motion

93. Pursuant to the Cash Management Motion, the Debtors request the Court (a) authorize the Debtors to (i) continue operating their cash management system, (ii) honor certain prepetition or postpetition obligations related to the cash management system, (iii) maintain existing business forms in the ordinary course of business, and (iv) continue performing intercompany transactions consistent with historical practice; and (b) grant

administrative expense status to the Intercompany Transactions among the Debtors and between the Debtors and their affiliates.

94. In the ordinary course of business, the Debtors operate a complex Cash Management System. The Cash Management System is a centralized cash system where money is collected from customers into main collection accounts which fund directly into operating accounts to fund payroll and pay vendors, and investment accounts. Debtor U.S. TelePacific Corp. remits money to non-Debtor TPx Managed Services Ireland Limited for payroll and related expenses for Irish employees employed by that entity (the "Intercompany Transactions"). The Company's treasury department maintains daily oversight of the Cash Management System and implements cash management controls for accepting, processing, and releasing funds, including in connection with any Intercompany Transactions. The Company's accounting department reconciles the Company's books and records monthly to ensure that all transfers are accounted for properly.

95. The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Company's to collect and disburse cash generated by their businesses, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, obtain accurate account balances and other financial data, forecast financial performance, and ensure cash availability and liquidity. The Cash Management System is narrowly tailored to meet the Company's operating needs while reducing administrative expenses. The Company estimates that the cash receipts flowing through the Cash Management System in the twelve months prior to the Petition Date averaged approximately $35 million per month. Given the economic and operational scale and complexity of the Company's enterprise, I understand that any disruption

to the Cash Management System would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders.

96. As of the Petition Date, the Company's Cash Management System consists of approximately seventeen (17) bank accounts. The Bank Accounts are maintained at seven (7) financial institutions: U.S. Bank N.A.; JPMorgan Chase, N.A.; Bank of Ireland; California Bank & Trust; EastWest Bank; Cambridge Savings Bank; and Western Alliance Bank. Sixteen of the Bank Accounts are owned and controlled by Debtor entities. One Bank Account is owned and controlled by non-Debtor TPx Managed Services Ireland Limited at Bank of Ireland. As of the Petition Date, the Debtors have approximately $16.4 million in cash in the Bank Accounts and have approximately $51,000 in cash that is collateral for the Credit Card Program (as defined herein) with JP Morgan.

97. The Company incurs periodic service charges and other fees in connection with maintaining the Bank Accounts (the "Bank Fees"). The Bank Fees primarily consist of service charges from the Cash Management Banks. The Company incurs approximately $26,000 per month, in the aggregate, in Bank Fees. As of the Petition Date, the Company estimates that they owe the Cash Management Banks approximately $51,000 on account of unpaid Bank Fees.

98. As part of the Cash Management System, the Company uses preprinted business forms, including checks, in the ordinary course of business (collectively, the "Business Forms"). The Company also maintains books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records"). The Debtors request authorization to continue using all of the Business Forms and Books and Records in the ordinary course of business and consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession

99. As part of the Cash Management System, the Debtors maintain three credit-card programs administered by American Express Company, JP Morgan, and WEX Enterprise to fund payments for accounts payable across the enterprise, paying certain vendors and other pre-approved expenses (collectively, the "Credit Card Programs"). The WEX Enterprise fleet management card program is specifically used to purchase fuel and obtain maintenance and repair services for the Debtors' fleet vehicles. The Debtors' combined monthly average spend under the Credit Card Programs is approximately $36,000. As of the Petition Date, the Debtors estimate that they owe prepetition amounts under the Credit Card Programs in the approximate amount of $70,000. However, in some circumstances the Company may still owe additional prepetition amounts under the Credit Card Programs where, for example, charges by employees in various locations have not been offset against the balance due to processing delays by merchants, among other factors.

100. I understand that the Debtors' inability to maintain the Credit Card Programs would impose a substantial hardship on the continued operation of the Debtors' businesses. It is my understanding that the Debtors rely on the Credit Card Programs to pay certain of their vendors that provide services critical to the Company, and as such the use of the Credit Card Programs is an integral part of the Cash Management System and is essential to the uninterrupted operation of the Debtors' business.

101. Also integral to the Cash Management System are ordinary course of business transactions that the Debtors engage in between Debtor entities and Non-Debtor TPx Managed Services Ireland Limited. On a monthly basis, the Debtors manually transfer funds into the Non-Debtor Operating Account for payroll, taxes, and employee benefits obligations for the

employees located in Ireland.[16] The Debtors can ascertain, trace, and account for all Intercompany Transactions through their general ledger and enterprise resources planning system, and the Debtors will continue to do so in the ordinary course of business and consistent with prepetition practice on a postpetition basis.

102. Based on the forgoing, and given the economic and operational scale and complexity of the Debtors' enterprise, I believe that any disruption to the Cash Management System would be incredibly disruptive to the Debtors' daily business operations and have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders. To minimize the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, I believe the Debtors should be authorized to continue their existing Cash Management System during the course of these Chapter 11 Cases.

### J. Critical Vendors Motion

103. Pursuant to the Critical Vendors Motion, the Debtors seek authorization to pay certain prepetition claims of vendors that provide critical services to the Debtors, primarily comprised of (i) network infrastructure providers, including network carriers and infrastructure providers; (ii) software and hardware vendors whose services the Debtors utilize in order to service their customers; and (iii) other vendors that provide systems, software, products, and related services that are critical to the Debtors' business operations.

104. The Debtors are a customer-facing provider of integrated communications and other solutions to businesses across the United States. In order to offer their services, the Debtors rely on a network of vendors to provide the Debtors network connectivity, communications infrastructure, physical equipment, software, and supplies necessary to support

[16] I understand that the transfers related to such Intercompany Transactions between the Debtors and Non-Debtor TPx Managed Services Ireland Limited average approximately $380,000 per month in the aggregate.

their operations. As such, the Debtors' ability to generate revenue, maintain customer relationships, and operate their business during these chapter 11 cases depends on uninterrupted access to such Critical Vendors. These Critical Vendors are embedded in the Debtors' business and are not readily replaceable, and any disruption in performance by such Critical Vendors would render the Debtors unable to guarantee the consistency of their services to their customers. In an industry that relies on instantaneous and real-time connection, even the slightest delay in the Debtors' supply chain would disrupt operations and materially jeopardize the Debtors' business.

105. The Critical Vendors fall into three categories: (a) Network Infrastructure Vendors; (b) Software and Hardware Vendors; and (c) Business Operations Vendors. These Critical Vendors are invaluable to the Debtors' operations, as they are either (i) the sole or limited-source supplier of certain goods and services that support the Debtors' daily operations and their ability to deliver services to customers, (ii) specific to the Debtors' contractual services provided to customers, or (iii) cannot easily be replaced without significant disruptions to the Debtors' business.

106. I understand that the Debtors' relationships with some of their vendors, including certain of the Critical Vendors, have been strained in the months leading up to the Petition Date. It is my understanding that the Debtors anticipate that vendor pressure will accelerate as a result of the commencement of these chapter 11 cases, and I understand that any disruption could be devastating to the Debtors' operations and hamper efforts to maximize value for their estates.

107. The success of the Debtors' business is based directly on the Debtors' ongoing relationships with the Network Infrastructure Vendors whose services and networks are necessary for the Debtors to deliver their services. Specifically, the Debtors operate an extensive and reliable carrier-grade network and infrastructure that delivers high-quality and secure

connections for their services, and the Debtors are only able to provide such services through the established networks and offerings of the Network Infrastructure Vendors. The Network Infrastructure Vendors provide service or interconnection to the Debtors who, in turn, then provide such service or interconnection to their customers with additional services and features. Said differently, the Debtors simply cannot provide services to their customers if there are any disruptions to the services or networks provided by the Network Infrastructure Vendors.

108. Importantly, the Network Infrastructure Vendors provide unique connectivity and service platforms that cannot be replicated easily—or sometimes at all—by other carrier providers. Some of the Network Infrastructure Vendors are the only carriers that provide connectivity in certain regions where the Debtors provide services, and there are simply no alternative carriers. In other regions, even if it were possible to replace a Network Infrastructure Vendor with an alternative, changing such vendors would be impracticable due to the cost and lead times required to engineer, install, test, and activate the circuits necessary for operations. I understand that the Debtors would need to invest substantial operational effort and cost to formulate a comparable network and migrate their existing customers onto any such platform, and the Debtors would be unable to operate during any such transition. Without the guaranteed continuity of the platform provided by the Network Infrastructure Vendors, the Debtors risk losing their ability to service customers, thus jeopardizing the Debtors' entire business platform.

109. While the Debtors generally receive services from the Network Infrastructure Vendors pursuant to contracts, the Debtors' postpetition ability to rely solely upon the contracts to compel continued performance by the Network Infrastructure Vendors may be constrained due to the unique relationship between the Debtors and their Network Infrastructure Vendors. Moreover, because solutions provided by the Debtors often rely upon a collection of services

provided by the Network Infrastructure Vendors, I understand that enforcement of an individual contract may be insufficient to ensure continued performance

110. Additionally, the Debtors utilize certain software and related services from Software and Hardware Vendors that are critical to the Debtors' business. Specifically, the Software and Hardware Vendors provide the software products, licenses, subscriptions, and related support that the Debtors then sell, implement, and manage for clients as part of the Debtors' integrated platform. In many instances, customer arrangements are contractually built around specific software products, and the Debtors manage these specific products on the customers' behalf. Because the customer's expectation is to utilize specific software, the Debtors necessarily need to maintain good relationships with such Software and Hardware Vendors or otherwise be in breach of their contractual obligations or create customer dissatisfaction.

111. The Debtors otherwise utilize certain other vendors that provide miscellaneous systems, software, hardware, products, and services that are not necessarily utilized by customers but are otherwise necessary for the Debtors' internal business operations and service-delivery infrastructure, including tools used for customer management, contracting, workflow and ticket management, and related enterprise functions. Certain of these Business Operation Vendors are foreign vendors that provide services related to customer sourcing, promotions, and software abroad. Other Business Operations Vendors include certain shipping providers and third-party logistics providers utilized by the Debtors to provide hardware—such as computing and networking equipment—to their customers and may constitute 503(b)(9) Claimants.

112. Without continued access to these tools and systems, the Debtors could face material disruptions in sales, contracting, customer support, and other core functions. The services and products provided by the Business Operations Vendors are critical to allow the

Debtors to manage customer relationships, administer service workflows, and maintain the operational infrastructure necessary to support the business. Failure to pay targeted prepetition Business Operations Claims therefore could materially impair the Debtors' ability to administer their business, maintain service levels, and execute ordinary-course operations during these chapter 11 cases.

113. As noted above, the Debtors may have received certain inventory, goods, and/or materials from 503(b)(9) Claimants within the twenty (20) days immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code. I understand the Debtors obtain much of their supplies and equipment from such claimants on an order-by-order or as-needed basis. As a result, a 503(b)(9) Claimant may refuse to fulfill new orders without payment of its 503(b)(9) Claims. I understand that such refusal could negatively affect the Debtors' estates as the Debtors' business depends on the steady flow of equipment and supplies to provide customer services.

114. Most of the Foreign Vendors have little or no connection to the United States. Although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, I understand the Debtors may not be able to enforce the stay in foreign jurisdictions if the creditor against whom enforcement is sought has minimal or no presence in the United States. As a result, despite the commencement of these cases and the imposition of the automatic stay, the Foreign Vendors may pursue remedies and seek to collect prepetition amounts owed to them. As such, I understand there is the real risk that Foreign Vendors may attach or seize the Debtors' assets in their jurisdictions or refuse to work or communicate with the Debtors which would significantly disrupt operations and the Debtors' reorganization efforts.

115. To mitigate the risks described above, the Debtors and their advisors engaged in a comprehensive process to (a) identify those vendors that are "critical" to the Debtors' business and go-forward operation and (b) quantify the relief necessary to avoid immediate and irreparable harm to the Debtors and their customers at the outset of these chapter 11 cases. In doing so, the Debtors, with the assistance of their advisors, evaluated a variety of qualitative and quantitative factors applicable across all three categories of Critical Vendors, including:

- the impact of non-payment on customers;
- the goods or services provided by a vendor;
- whether goods or services are provided pursuant to a contract or on a purchase-order basis;
- the Debtors' ability to continue operating while transitioning business to an alternative supplier, if available, and how long such a transition would take;
- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) would exceed the amount of a vendor's prepetition claim;
- which suppliers would be prohibitively expensive or practically difficult to replace;
- which suppliers would present an unacceptable risk to the Debtors' operations given the volume or type of essential services or products that such suppliers provide;
- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;
- whether a vendor is currently refusing to supply the Debtors with goods or services or is refusing to do so without cash up front;
- whether the Debtors' inability to pay all or part of a vendor's prepetition claim could trigger financial distress for the applicable vendor, leading to future difficulty of that vendor's ability to perform; and
- whether a vendor was located in a jurisdiction that would likely honor the applicability of the Bankruptcy Code.

116. After a thorough analysis involving an assessment applying the above factors, the Debtors designated certain vendors and processes as necessary to legally and financially continue operations without negatively impacting customers and, thus, preserve value for the benefit of the estates and creditors. The relief requested in this Motion seeks to pay prepetition amounts owed to the Critical Vendors in an amount not to exceed the Critical Vendor Cap of $8,100,000 on an interim basis—which represents approximately 24% of estimated overall prepetition amounts owed to vendors and payors—and $13,400,000 on a final basis—which represents approximately 40% of overall estimated prepetition amounts owed to vendors and payors.

117. The Debtors' selection process balanced the need to ensure that these chapter 11 cases do not disrupt their operations or negatively impact customers, with the need to limit the expenditure of estate resources. In that regard, the Debtors undertook a lengthy process to ensure that the Critical Vendors truly represent those vendors most vital to the Debtors' ongoing operations. Paying targeted prepetition claims of the Critical Vendors will benefit the Debtors' estates, both monetarily and operationally, by preserving liquidity and enabling the Debtors to operate smoothly during these chapter 11 cases.

118. I understand that, as a condition to receiving payment on account of the Critical Vendor Claims, the Debtors may require such Critical Vendors to: (a) continue supplying goods and services to the Debtors on trade terms that are at least as favorable to the Debtors as those in effect prior to the Petition Date and (b) agree that they shall not be permitted to cancel any contract or agreement pursuant to which they provide services to the Debtors (collectively along with any other terms, the "Agreed Terms"); *provided* that the Debtors continue to pay for such goods and services and are not otherwise in breach of such contract or agreement.

119. Accordingly, I believe that the relief requested in the Critical Vendors Motion is necessary to avoid unnecessary disruption to their businesses and ensure a timely restructuring

process. I therefore believe, based upon the foregoing, that the relief requested is essential, appropriate, and in the best interests of the Debtors, their creditors and all parties in interest.

**K. Customer Programs Motion**

120. Pursuant to the Customer Programs Motion, the Debtors seek authorization to (i) maintain and administer their existing Customer Programs and (ii) honor certain related prepetition obligations on a postpetition basis in the ordinary course.

121. In the ordinary course of business, the Debtors provide their Customers with various programs that are vital to the Debtors' ability to increase sales opportunities, drive revenue generation, and position the Debtors to compete within their markets. The Debtors' business depends upon the support of their Customers, as well as their ability to attract new Customers. To maximize value to Customers, the Debtors have maintained and followed, in the ordinary course of business, certain practices and programs for the benefit of their Customers, including Customer Promotions, Service Adjustments, Subsidy Programs, and Customer Refunds.

122. *Customer Promotions*. Consistent with industry practice and in order to develop, maintain, and expand their Customer relationships, the Debtors provide certain promotional credits to new and existing Customers. Specifically, the Debtors offer certain new and existing Customers bill credits to apply prospectively to certain future monthly payments to the Debtors (the "Customer Promotions"). Customer Promotions are offered on a discretionary basis by sales representatives and vary in duration and amount, depending on the Customer. The Debtors utilize Customer Promotions as a tool to incentivize (i) prospective Customers to purchase new services from the Debtors and (ii) existing Customers to renew service contracts with the Debtors. The Customers have come to rely on, and benefit from, the Customer Promotions, and any failure to honor the Customer Promotions may cause the Customers to terminate, or fail to

renew, their respective contracts with the Debtors. The Debtors' ability to honor and continue the Customer Promotions is crucial for the Debtors to conduct day-to-day business and to remain a competitively managed services provider.

a. *Service Adjustments*. The Debtors are committed to Customer satisfaction and quality assurance, and occasionally remedy lapses in services with credits, offered as a courtesy, to ensure the satisfaction of Customers ("Customer Outage Credits"). In general, if a Customer experiences an outage (excluding planned and maintenance-related outages), the Customer may request that the Debtors provide a Customer Outage Credit to the Customer's account. The Customer may request a Customer Outage Credit by submitting an outage request to the Debtors within 45 days of the repair ticket being closed.[17] The Debtors' finance team investigates outage and other service complaints, and, if approved, applies a credit to the Customer's monthly bill. A Customer Outage Credit is calculated as follows: for each hour of outage beyond the initial four hours, the Customer receives one day of credit, and if the outage exceeds 29 hours, the Customer receives a credit equal to one month. Customer Outage Credits represent an important source of security for Customers, many of whom demand them as a part of doing business. Additionally, in the ordinary course of business, the Debtors apply account adjustments in the form of credits to Customer invoices (the "Customer Account Adjustments" and together with the Customer Outage Credits, the "Service Adjustments"). Customer Account Adjustments include corrections for incorrectly billed or misapplied Customer payments, fees, and other errors. Service Adjustments are vital to ensuring the continued loyalty, support, and goodwill of Customers during the Debtors' restructuring. The Debtors prize the satisfaction of their

[17] The Debtors may, in their discretion, provide Customer Outage Credits for requests submitted after the 45-day period.

Customers highly and strive to increase trust in their services by offering Service Adjustments to remedy lapses in services or other errors that inconvenience their Customers.

123. *Subsidy Programs*. The Debtors participate in government subsidy programs administered by the Universal Service Administrative Company ("USAC") for eligible schools and libraries in the U.S. (the "USAC Program") and the California Public Utilities Commission ("CPUC") for eligible schools, libraries, hospitals, and community organizations in California (the "CPUC Program" and together with the USAC Program, the "Subsidy Programs"). I understand that the USAC Program is designed to provide a 20-90% discount of the full-price service to K-12 schools and libraries. Schools and libraries who wish to enroll in the USAC Program submit their requested services to USAC, and the requested services are displayed on the USAC's website so the Debtors, and other vendors, can submit bids. If the Debtors are chosen to provide the service, the library or school will be enrolled in the USAC Program and be issued a funding commitment by the USAC, pursuant to which USAC will pay the difference of the full-price rate and discounted rate (the "USAC Funding Commitment"). Certain Customers pay the Debtors a rate reduced by the amount of the USAC Funding Commitment, and the Debtors submit requests to USAC for reimbursement in the amount of the USAC Funding Commitment. The Debtors typically submit monthly requests to USAC for reimbursement, however, some requests lag due to delays in a Customer's application process. I understand that the CPUC Program is designed to provide a discount of the full-price telecommunication service to different eligible schools, libraries, hospitals, and community organizations in California (the "CPUC Credits"). If a Customer is approved to participate in the CPUC Program, the Debtors will apply CPUC Credits to the Customer's account, and submit a claim to CPUC for reimbursement of the CPUC Credits. The Debtors submit their reimbursement requests to CPUC on a monthly basis. I understand that participation in the Subsidy Programs is vital to the

Debtors' continued success in servicing their clients who participate in the Subsidy Programs. Without the Debtors' participation in the Subsidy Programs, the Debtors would lose their Customers to competitors who could offer services at discounted prices, thus undercutting the Debtors' sales, decreasing revenue, and increasing Customer turnover. To prevent this harm to the Debtors' business and to effectuate the successful restructuring of the Debtors' business in these chapter 11 cases, the Debtors request the continued participation in Subsidy Programs.

124. *Customer Refunds*. When a Customer disconnects or cancels their account with the Debtors, the Debtors will reconcile the Customer's account balance including any outstanding credits. Following this reconciliation, the Debtors will distribute a refund check to the former Customer for any remaining balance or credits in the account (the "Customer Refunds") and close the account. The Debtors have typically paid approximately $100,000 per month in Customer Refunds over the last twelve months. Due to the importance of the Customer Refunds to the Debtors' business, the Debtors request by this Motion, the authority to incur, honor, pay, continue, or otherwise satisfy any and all ordinary course prepetition and postpetition obligations related to the Customer Refunds, and to continue to pay Customer Refunds in the ordinary course of business and in a manner that is consistent with past practice.

125. Accordingly, the Debtors seek authority to continue the Customer Programs in the ordinary course of business and to perform and honor their prepetition obligations thereunder. I believe that continuing the Customer Programs and to honor the obligations thereunder is necessary for the Debtors to reassure their customers of the ongoing viability of the Debtors, preserve goodwill, and to maintain critical business relationships. I therefore believe that continuing the Customer Related Programs in the ordinary course of the Debtors' business and performing and honoring prepetition obligations arising under such Customer Programs is in the best interests of the Debtors, their estates, and their creditors.

### L. DIP Motion

126. As discussed above, over the past year, the Company has been in extensive discussions with the Ad Hoc Group and the Consenting Investor to explore strategic alternatives to address the Debtors' balance sheet. To offer the Company breathing room and additional liquidity runway to effectuate a comprehensive restructuring, the Ad Hoc Group and Consenting Investor agreed to enter into the Forbearance Agreements with the Company. Moreover, the Ad Hoc Group and the Consenting Investor provided the Company with $20 million in bridge financing in order to sustain the Debtors' businesses while restructuring negotiations continued. Pursuant to the Restructuring Support Agreement, participating lenders and the Consenting Investor have committed to provide $20 million of new money debtor-in-possession financing in the form of a superpriority term loan facility. Participation in the DIP Facility was offered on the same terms to all lenders under the First Lien Term Loan Facility and the Revolving Credit Facility.

127. In the weeks leading up to the Petition Date, Portage Point evaluated the Debtors' forecasted cash flow and liquidity needs in a chapter 11 scenario to determine the amount of DIP financing required to operate the Debtors' businesses and pay administrative costs during these Chapter 11 Cases. Moreover, Portage Point has evaluated the quantum of DIP financing required to consummate the transactions contemplated by the Restructuring Support Agreement and Plan agreed to by the Debtors, the Ad Hoc Group, and the Consenting Investor. Based on this analysis, the Debtors and their advisors determined that approximately $20 million of new money financing and access to cash collateral would be required to finance their operations and maintain positive liquidity during these Chapter 11 Cases through the end of 2026.

128. Based on my review of the Debtors' books and records, the Debtors are entering chapter 11 with approximately $16.4 million of cash on hand, and available liquidity will be

exhausted shortly after the Petition Date absent additional financing. As set forth in the Approved Budget, the Debtors expect that they will need approximately at least $10 million during the interim period prior to final DIP approval, and approximately $20 million through the end of 2026. The proposed draw structure and the interim commitment amount is necessary and appropriately tailored to the Debtors' funding needs.

129. The Debtors will require immediate access to DIP financing and the authority to use cash collateral throughout the chapter 11 process to ensure they have additional liquidity to operate their businesses, maintain business relationships with their customers, vendors, and suppliers, meet their employee payroll, pay the costs of administering the Chapter 11 Cases, and satisfy other working capital and operational needs of the Debtors. The Debtors' Initial DIP Budget is attached to the Interim DIP Order as Exhibit 2. The Initial Approved Budget reflects the Debtors' need for DIP financing to fund these Chapter 11 Cases. Based on the assumptions used to develop the Initial Approved Budget, the DIP financing will allow the Company to maintain a positive cash balance during the period reflected in the Initial Approved Budget and, in the Debtors' business judgment, will be sufficient to fund the Debtors' operations, expenses, and administrative needs through the end of 2026. I do not believe it would be prudent, or even possible, to administer the Debtors' chapter 11 estates on a "collateral-only" basis. Without access to the DIP Facility, the Debtors would have limited cash on hand and would be unable to generate sufficient cash flow from operations to cover their working capital needs and the projected administrative costs of these Chapter 11 Cases.

130. Without approval of the DIP Facility on an interim basis and access to the $10 million upon entry of the Interim DIP Order, I believe the Debtors will suffer immediate and irreparable harm, as they will be unable to continue operating their business while pursuing confirmation of their Plan and, instead, will likely exhaust their remaining liquidity. Delay in

approving the DIP Facility will only serve to deplete the Debtors' assets to the detriment of all stakeholders.

131. I believe the proposed DIP Facility is necessary, and essential to fund these Chapter 11 Cases and provides significant benefit to—and is fair and equitable to—the Debtors, their estates, and the Debtors' stakeholders. Entry into the DIP Facility will provide the Debtors with additional liquidity to operate their business during these Chapter 11 Cases, providing certainty regarding the restructuring process and instilling confidence in the Debtors' vendors, customer base, employees, and counterparties that the Debtors will be able to continue operating in the ordinary course after the Petition Date.

132. Based on the foregoing, it is my belief that the proposed DIP Facility and use of Cash Collateral is necessary to address the Debtors' immediate liquidity needs, and that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances. Accordingly, I believe that the proposed DIP Facility should be approved on the terms and conditions described in the DIP Documents and the Interim DIP Order, and entry into the DIP Facility reflects a sound exercise of the Debtors' business judgment.

### M. Employee Wages Motion

133. Pursuant to the Employee Wages Motion, the Debtors seek authority to (i) pay prepetition wages, salaries, employee benefits, other compensation, and reimbursable expenses and (ii) continue the post-petition maintenance of any employee benefit programs, policies, and procedures in the ordinary course of business.

134. The Debtors' employees are key to their business—the continued service and morale of the Debtors' employees is essential to maintaining uninterrupted operations and maximizing the value of the Debtors' estates for the benefit of all stakeholders. Further, the Debtors' employees are highly trained and uniquely well-versed in the industry in which the

Debtors operate. The Debtors' operations are complex and could not be continued without their employees.

135. The Debtors seek to eliminate any personal hardship to their workforce resulting from these chapter 11 cases and to minimize the disruption to the Debtors' operations. As of the Petition Date, certain of the Debtors' prepetition obligations to their workforce and other related third-party service providers (all such wages, benefits, and other obligations described herein, collectively, the "Prepetition Employee Obligations") remain unpaid because among other things, the amounts related to the prepetition services, while accrued in whole or in part, had not yet become due and payable by the Debtors, and amounts deducted or withheld from Employees' paychecks were not then due to be paid to the intended third-party recipient or bank account, including payments on behalf of the Employees in respect of the Employee Benefit Programs or amounts due to third parties in connection therewith, and income, garnishment, state disability, unemployment, and other taxes for remittance to the appropriate federal, state, or local taxing authorities.

136. The Debtors' Employees and Independent Contractors rely on the compensation and benefits they receive through the programs described in this Motion to pay their daily living expenses and support their families. Granting the relief requested will enable the Debtors to maintain morale, enhance the Debtors' ability to retain and attract their valuable workforce, and otherwise eliminate any personal hardship, including to employees, as a result of these chapter 11 cases which, in turn, will maximize value for the benefit of all stakeholders.

137. The Debtors seek authority to pay, remit, and/or honor the accrued and unpaid Prepetition Employee Obligations set forth below:

| Relief Sought | Amount |
|---|---|
| **Prepetition Employee Obligations** | |
| Unpaid Compensation for Employees[18] | $1,400,000 |
| Employer Payroll Taxes | $300,000 |
| Processing Fees | $25,000 |
| Independent Contractors[19] | $1,540,000 |
| Commission Program[20] | $4,300,000 |
| Incentive Compensation Programs | |
| a. Short Term Incentive Plan | $0 |
| b. Long Term Incentive Plan | $0 |
| Business and Out of Pocket Expenses | $150,000 |
| Director Compensation | $0 |
| Severance Obligations | $650,000 |
| **Employee Benefit Programs** | |
| Medical and COBRA Plans | $1,300,000 |
| Dental and Vision Plans | $65,000 |
| FSA and HSA Programs | $60,000 |
| Basic Life, AD&D, and Disability Insurance | $60,000 |
| Critical Illness and Accident Insurance | $10,000 |
| 401(k) Plan | $1,700,000 |
| Workers' Compensation Program | $0 |
| Paid Absences | $40,000 |
| Ancillary Benefit Programs | $20,000 |
| **Total** | **$11,620,000** |

138. As of the Petition Date, the Debtors employ and retain approximately 575 employees. Of these Employees, approximately 160 are either full- or part-time hourly Employees and the remaining approximately 410 are salaried Employees. Throughout the pendency of these chapter 11 cases, the Employees will continue to provide critical functions to the Debtors including, but not limited to, maintaining core network engineering, interfacing with customers and counterparties, responding to inquiries and concerns regarding the business, and

[18] This amount includes $700,000 in Withholding Taxes and Obligations for Employees.

[19] The amount noted for Independent Contractors excludes commissions earned by Independent Contractors under the Commissions Program, which are separately included in the Commission Program amount set forth below.

[20] Amount indicated is for both Employees and Independent Contractors. As noted below, approximately $3,200,000 is owed to Independent Contractors, with the balance owed to Employees.

maintaining legal and regulatory compliance. The Employees are also critical to the ongoing marketing efforts and administration of these chapter 11 cases.

139. The Debtors supplement their workforce with various contractors and consultants (collectively, the "Independent Contractors"). These Independent Contractors are necessary for the ongoing operation of the Debtors' business. The Independent Contractors provide services including, but not limited to, IT operations support, billing support, sales, service delivery, and project-based work on an as-needed basis. The Debtors utilize approximately 300 to 500 Independent Contractors at any given time, all of whom play a critical role in the Debtors' day-to-day operations and, thus, to the preservation of value of the Debtors' estates. The Debtors utilize the services of APFS Staffing Inc., ATG Business Solutions Private Limited, Movate, Inc., International Business Machines Corporation, J-Curve Technologies, and Mouri Tech LLC (collectively, the "Professional Staffing Services Providers") to provide the Debtors with Independent Contractors as needed. The Debtors also utilize the services of approximately 130 third-party firms and agents who provide sales services (the "Sales Services Providers" and together with the Professional Staffing Services Providers, the "Sale and Staffing Services Providers") to provide the Debtors with Independent Contractors as needed.

140. In the ordinary course of business, the Debtors pay their Employees according to bi-weekly payment cycles. Employees are paid five days in arrears. On average, the Debtors' aggregate gross monthly payroll for their Employees is approximately $5,510,000. The Debtors estimate they owe approximately $1,400,000 to Employees in accrued and unpaid wages and salary (the "Unpaid Compensation") for prepetition services rendered through the Petition Date and seek authority to honor their payroll obligations by paying in the ordinary course any Unpaid Compensation owed to the Employees. I understand that the Unpaid Compensation due to each

Employee is less than the $17,150 priority limit on account of prepetition salaries or wages under section 507(a)(4) of the Bankruptcy Code (the "Priority Limit").

141. In connection with the wages and salaries paid to Employees, the Debtors are required by federal, state, and local law to withhold certain amounts for federal, state, and local income taxes, garnishments, and withholdings in connection with various employee benefits and other employee programs (collectively, the "Withholding Taxes and Obligations") and to remit the withheld amounts to the appropriate taxing and other governmental authorities. As part of administering payroll, some of the Withholding Taxes and Obligations are deducted directly from the Debtors' payroll account to remit to the appropriate taxing authorities and employee benefit providers. As of the Petition Date, the Debtors estimate that approximately $700,000 remains due and owing on account of the Withholding Taxes and Obligations.

142. In addition to the Withholding Taxes and Obligations, the Debtors are required by federal, state, and local law to pay employer-side payroll taxes, including the employer's share of Social Security and Medicare taxes, federal and state unemployment taxes, and other similar employment-related taxes (collectively, the "Employer Payroll Taxes"). As of the Petition Date, the Debtors estimate that approximately $300,000 remains due and owing on account of Employer Payroll Taxes. The Debtors seek authority to pay unpaid amounts in accordance with prepetition practices and to continue paying such amounts in the ordinary course of business postpetition.

143. The Debtors utilize Automatic Data Processing, Inc. ("ADP") (the "Payroll Processor"), as their third-party payroll processor for Employees and fund payroll, and certain other Prepetition Employee Obligations, by direct deposit through an electronic transfer of funds to Employees' bank accounts. The Debtors estimate that they pay approximately $25,000 every month to the Payroll Processor on account of prepetition payroll processing services

(the "Processing Fees"). As of the Petition Date, the Debtors estimate they owe approximately $25,000 on account of Processing Fees.

144. On average, the Debtors pay the Independent Contractors approximately $4,400,000 per month, of which approximately $3,500,000 represents commissions to external sales firms and agents. While most of the Independent Contractor arrangements are facilitated through the Sale and Staffing Services Providers, the Debtors also maintain certain agreements directly with individual contractors. As of the Petition Date, the Debtors estimate that approximately $4,740,000 is due and owing to the Independent Contractors, of which approximately $3,200,000 is owed to Independent Contractors under the Commission Program (as defined below). I understand that, except for commission-based sales agents, no Independent Contractor contracting directly with the Debtors is owed amounts in excess of the Priority Limit. With respect to Independent Contractors supplied through Sale and Staffing Service Providers and providers of external sales agent services, the Debtors do not directly determine or control the individual compensation paid to each such contractors, as such compensation is contingent upon the payment structure set forth in the parties' applicable agreements.

145. The Debtors maintain an incentive program based on commissions (the "Commission Program") for non-Insider[21] Employees and Independent Contractors. Payment under the Commission Program is primarily determined by booked monthly recurring revenue on products and services. Payments under the Commission Program are typically paid once a month and one month in arrears. Given that prepetition amounts due under the Commission Program are paid in arrears and have not been determined as of the Petition Date, the Debtors are unable to determine with certainty if and how much of the payments would cause Employee Obligations to exceed the Priority Limit. Because the Commission Program is an

[21] "Insider" has the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

important aspect of those qualifying Employees' and Independent Contractors' overall compensation, I understand the Debtors have proposed procedures below that allow for the Debtors to pay Employee Obligations, including those that exceed the Priority Limit, while providing transparency and an opportunity for certain parties-in-interest to object. Maintaining historical practices is essential to ensuring that the Debtors can retain their Employees and Independent Contractors and continue to operate business and maximize value through the duration of these chapter 11 cases. As of the Petition Date, approximately $4,300,000 is estimated to be due and owing under the Commission Program, of which approximately $3,200,000 is due and owing to Independent Contractors and the remaining $1,100,000 to Employees.

146. The Debtors maintain programs to motivate, reward, and retain certain of their Employees (collectively, the "Incentive Compensation Programs"). These Incentive Compensation Programs are essential to the Debtors' ability to both recruit and retain valuable and talented employees by incentivizing Employees to perform at high levels and achieve certain sales and other metrics. Accordingly, covered Employees rely on and anticipate their compensation pursuant to these Incentive Compensation Programs.

147. The Incentive Compensation Programs are divided into two categories: (a) the short-term incentive compensation plan and (b) the long-term incentive plan:

a. Short Term Incentive Plan: In the ordinary course of business, the Debtors maintain an annual short-term incentive-based compensation program (the "STIP"). The STIP is available to all U.S.-based Employees other than (i) those who are eligible for sales incentives or the Commission Program and (ii) Hourly Employees. The STIP is also not available to Independent Contractors. The STIP is an established component of the Debtors' overall employee compensation program and designed to incentivize and reward eligible Employees for company and individual performance annually. Under the STIP, eligible Employees are assigned target incentive opportunities based on their position, and any award is determined based on a combination of factors, including the Debtors' financial performance, the Employee's individual performance in the applicable plan year,

and the Employee's target incentive opportunity. The STIP only becomes payable upon the achievement of specified financial performance thresholds. Any payments under the STIP are made in a single lump-sum cash payment following the close of the applicable fiscal year. All payments under the STIP are discretionary and may be reduced or eliminated. The Debtors believe that the STIP is an important component of their overall compensation program and assists the Debtors in motivating, rewarding, and retaining key Employees. Accordingly, the Debtors intend to continue the STIP during the pendency of these chapter 11 cases in the ordinary course of business. The Debtors are requesting authority to make payments pursuant to the STIP in the ordinary course of business in such amounts as may become due.

b. Long Term Incentive Plan: The Debtors maintain one long-term incentive plan (the "LTIP"), pursuant to which Employees receive compensation in the form of incentive rights that represent a contingent right to payment in the future which may be settled in cash. Subject to certain restrictions, the Debtors must pay Employees (i) any amounts owed on their vested incentive rights within sixty days after a liquidity event, and (ii) any amounts owed on vested incentive rights within sixty days after the earlier of six months following a sale event or a qualifying termination without cause after the sale event. The Debtors are requesting authority to make payments pursuant to the LTIP in the ordinary course of business in such amounts as may become due.

148. Payments pursuant to the STIP are made on an annual basis and may become payable during the pendency of these chapter 11 cases, including payments attributable to services performed prior to the Petition Date. The Debtors do not anticipate any payments pursuant to the LTIP to be made prior to the Effective Date.

149. Prior to the Petition Date, and in the ordinary course of business, the Debtors reimbursed Employees for certain business expenses incurred in the scope of their employment, including travel, lodging, ground transportation, meals, automobile usage (gas or mileage) and other miscellaneous business expenses (collectively, the "Business Expenses").

150. Certain Employees, for the benefit of the Debtors, pay for Business Expenses (collectively, the "Out of Pocket Expenses") with the understanding that they will be reimbursed upon the submission of a receipt or claim itemizing expenses in accordance with the Debtors' reimbursement policy. The Debtors utilize Concur Technologies, Inc. in connection with

reimbursement of these Business Expenses. The Debtors estimate, on average, that approximately $150,000 per month is reimbursed to Employees for Out of Pocket Expenses. As of the Petition Date, the Debtors estimate that approximately $150,000 remains due and owing for Out of Pocket Expenses.

151. Although the majority of Employees submit their reimbursement requests timely, sometimes submissions are delayed, which may result in Employees submitting requests for prepetition Business Expenses after the Petition Date. Employees incur Business Expenses on the Debtors' behalf and with the understanding that such expenses will be reimbursed fully.

152. As of the Petition Date, the Debtors have 15 directors (each, a "Director" and collectively the "Directors"), 11 of whom are non-Employees. The non-Employee Directors are paid cash compensation on a monthly basis and are entitled to expense reimbursement for all reasonable and documented out-of-pocket business expenses incurred in connection with their duties (the "Director Compensation"). As of the Petition Date, there is no outstanding amount with respect to the Director Compensation.

153. The Debtors do not maintain a formal written severance policy but historically pay severance (each a "Severance Payment," and collectively, the "Severance Obligations") to terminated Employees in appropriate circumstances based on an evaluation of the specific facts and circumstances of the applicable termination. Certain other Severance Obligations are made to Employees pursuant to the terms of an applicable employment agreement.

154. The Debtors believe that the authority to pay the Severance Obligations is critical to maintaining existing Employee morale and loyalty and allows the Debtors to remain competitive in attracting new talent. Any instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation and to be positioned for long-term success. Furthermore, in certain circumstances, the Severance Obligations are

contractually obligated. As of the Petition Date, the Debtors estimate that approximately $650,000 of prepetition Severance Obligations remain outstanding.

155. In the ordinary course of business, the Debtors offer private health insurance coverage and certain other welfare benefits to Eligible Employees, including but not limited to, medical plans, dental plans, vision plans, flexible spending accounts (each an "FSA"), health savings accounts (the "HSA"), life insurance plans, short-term and long-term disability plans, other paid time off, a 401(k) plan, and other miscellaneous benefit plans (collectively, the "Employee Benefit Programs"). The Employee Benefit Programs are, in each case, available to all Employees who work the requisite hours per week for a given benefit or who otherwise satisfy the eligibility requirements for any Employee Benefit Program (the "Eligible Employees" and, with respect to each plan or program in which they participate, the "Plan Participants"). The Debtors utilize the Alera Group, Inc., as a broker to, among other things, coordinate the Debtors' various vendor relationships, evaluate renewals, and promote compliance with respect to the Employee Benefit Programs.

156. The Debtors offer Eligible Employees an opportunity to participate in a variety of health benefit plans, including Medical Plans, Dental Plans, and Vision Plan (each as defined and described in further detail in the Employee Wages Motion, the "Health Insurance Plans"). The Debtors withhold applicable amounts from plan Participants' paychecks, but do not contribute premiums to the Health Insurance Plans. Instead, the Debtors self-fund the Health Insurance Plans and pay claims as they arise. As of the Petition Date, the Debtors estimate that the aggregate amount due and owing under the Health Insurance Plans is approximately $1,495,000.

157. The Debtors provide certain Eligible Employees with retirement benefits through a 401(k) plan administered by Empower Trust Company, LLC (the "401(k) Plan"). Eligible Employees may participate in the 401(k) Plan and make Roth and pre-tax contributions, up to the

maximum amount allowed under the Internal Revenue Code. There are approximately 500 Employees with current account balances in the 401(k) Plan (the "401(k) Program Participants").

158. Under the 401(k) Plan, the Debtors may make annual discretionary matching contributions to 401(k) Program Participants' eligible contributions. The Debtors' contributions are vested at 50% after one year of employment and 100% after two years of employment. As of the Petition Date, the Debtors estimate that they owe approximately $1,700,000 under the 401(k) Plan. The Debtors seek authority to pay such outstanding amounts, continue to maintain the 401(k) Plan, and honor their obligations in the ordinary course.

159. The Debtors maintain workers' compensation programs and workers' compensation insurance and benefits at the levels required by law in the U.S. and make payments on account of workers' compensation claims (the "Workers' Compensation Program"). The Debtors maintain coverage under the Workers Compensation Program through Travelers Property Casualty Company of America. In the twelve months before the Petition Date, the Debtors paid approximately $280,000 in fees and premiums under the Workers' Compensation Program. As of the Petition Date, the Debtors do not believe any amounts remain outstanding under the Workers' Compensation Program.

160. In the ordinary course, all Employees are eligible for flexible time off ("FTO"), which can be used for vacation, personal appointments, family matters, sick days, school activities, religious observances, rest and relaxation, and other personal obligations (the "FTO Policy"). FTO does not accrue and is not paid out upon termination of employment for any reason. The Debtors seek authorization to continue the FTO Policy in the ordinary course of business. I understand that the Debtors comply with local regulations regarding paid time off for various other causes, including sick and medical leave, family leave for, among other things, the

birth of a child or serious health condition of a spouse or child, and government leave for, among other things, voting, jury duty, and military obligations.

161. The Debtors offer a paid absences policy to certain Eligible Employees (the "Paid Absence Policy"). The Paid Absence Policy allows Eligible Employees to take time off for holidays, bereavement leave, jury duty, voting leave, military leave, paid family/medical leave, and public health emergency leave. The Debtors believe that the continuation of the Paid Absence Policy in accordance with historical practice is essential to maintaining Employee morale during these Chapter 11 Cases. As of the Petition Date, the Debtors estimate they owe approximately $40,000 with respect to the Paid Absence Policy.

162. In addition to the foregoing, in the ordinary course of business, the Debtors also offer Employees a range of ancillary benefits, including, but not limited to, (a) company automobiles; (b) cell phone reimbursements; (c) work from home stipend; (d) legal services program administered by Legal Access Plans, LLC; and (e) pet insurance administered by Insurance Agency, Ltd., Spot Pet Insurance (collectively, the "Ancillary Benefit Programs").

163. In the twelve-month period preceding the Petition Date, the Debtors paid approximately $50,000 per month on average on account of the Ancillary Benefit Programs. As of the Petition Date, the Debtors estimate they owe approximately $20,000 with respect to the Ancillary Benefit Programs. The Debtors do not fund all of the Ancillary Benefit Programs, some of which are entirely employee-paid without any contributions from the Debtors. I understand that the Ancillary Benefit Programs are an important component of the compensation package that the Employees have come to expect.

164. The Debtors' Employees and Independent Contractors are critical to ordinary course operations because a significant portion of the value of the Debtors' business is tied to their workforce. Without such relief, the Employees and Independent Contractors may face

significant financial strain and other hardships. I therefore believe the relief requested in the Employee Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

**N. Insurance Motion**

165. Pursuant to the Insurance Motion, the Debtors seek authority to, in consultation with the Ad Hoc Group, (i) continue their prepetition insurance coverage and satisfy prepetition obligations related thereto, (ii) renew, amend, supplement, extend, or purchase insurance coverage on a postpetition basis in the ordinary course, (iii) pay or offset prepetition obligations on account of and continue to pay brokerage fees on a postpetition basis in the ordinary course, and (iv) maintain their surety bond program.

166. In the ordinary course of business, the Debtors maintain twenty-one (21) insurance policies (collectively, the "Insurance Policies") with seventeen (17) insurance carriers (collectively, the "Insurance Carriers"). The Insurance Policies provide coverage for, among other things, losses related to the Debtors' general liability, property, inland marine, automobile liability, workers' compensation, umbrella, management and directors' and officers' liability, directors' and officers' excess liability, international liability, cyber liability, and flood liability. In addition, certain of the Insurance Policies provide layers of excess liability coverage.

167. To preserve the value of the Debtors' business operations, properties, and assets, I understand that it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance agreements. I understand that, in many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and the operating guidelines issued by the United States Trustee for Region 7.

168. In the ordinary course of business, the Debtors, directly or through brokerage accounts, pay premium obligations associated with the Insurance Policies (the "Premiums"). The Debtors paid an aggregate amount of approximately $2.2 million in Premiums in the last twelve months for the current insurance policies, including taxes and surcharges, other fees, and broker commissions. The Debtors are not subject to any premium financing agreement. For the current Insurance Policies, the Debtors have prepaid all Premiums in full, although historically the Debtors paid premiums on a monthly basis over the course of the policy period. As of the Petition Date, the Debtors believe that no amounts are due or owing on account of Premiums for the Insurance Policies.

169. Certain of the Insurance Policies require the Debtors to pay a deductible (collectively, the "Deductibles"). Generally, if a claim is made under an Insurance Policy with a Deductible, the Debtors are obligated to pay any defense costs and indemnity payments up to the amount of the Deductible. Carriers are directly responsible for any claim under the applicable Insurance Policy to the extent such claim is in excess of the Deductible.

170. The Debtors obtain Insurance Policies primarily through one (1) insurance broker Marsh USA, Inc. (the "Broker"). The Broker assists the Debtors in obtaining comprehensive insurance coverage and with negotiating the prices and terms and conditions of the Insurance Policies, enabling the Debtors to obtain Insurance Policies on advantageous terms and at competitive rates. The Broker collects fees for services rendered as part of the Premiums paid on the Insurance Policies (the "Insurance Brokerage Fees" and, together with the Surety Brokerage Fees (defined below), the "Brokerage Fees"). The Broker is paid approximately $150,000 annually in Brokerage Fees as related to the Insurance Policies for which it acts as broker.

171. Certain of the Insurance Policies, including workers' compensation and auto policies, are subject to regular audits (the "Insurance Policy Audits"), which may result in an

adjustment of the premiums owed on account thereof. Insurance Policy Audits for prepetition premium payments will not conclude until after the Petition Date. As a result, the aggregate amount of the Debtors' obligations arising from the Insurance Policy Audits, if any, is not known at this time.

172. In the ordinary course of business, the Debtors maintain surety bonds (collectively, the "Surety Bonds") to secure their obligations with respect to maintaining their telecommunications operating authority, licenses, permits, registrations, and other regulatory approvals, including but not limited to performance bond requirements imposed by state public utility commissions, utilities, and other governmental authorities. The Debtors have three (3) surety providers: Hartford Fire Insurance Company, Atlantic Specialty Insurance Company, and Travelers Casualty and Surety Company of America (collectively, the "Sureties"). The Debtors' Surety Bonds are with (i) Hartford Fire Insurance Company in the amount of $385,000, (ii) Atlantic Specialty Insurance Company in the amount of $50,000, and (iii) Travelers Casualty and Surety Company of America in the amount of $115,000 (such program, the "Surety Bond Program"). The Debtors obtain the Surety Bonds also through the Broker. The fees paid to the Broker (the "Surety Brokerage Fees") are included as part of the Brokerage Fees payable to Marsh USA, Inc. As of the Petition Date, the Debtors have sixteen (16) Surety Bonds totaling approximately $550,000, the premiums for which are approximately $8,000. As of the Petition Date, the Debtors believe there are no amounts outstanding on account of the Surety Bonds.

173. To continue business operations during the reorganization process, the Debtors must be able to provide financial assurance to certain of the Insurance Carriers. This requires the Debtors to maintain the Surety Bonds. I understand that failing to provide, maintain, back, or timely replace the Surety Bonds will prevent the Debtors from, among other things, complying

with their federal law obligations, and consequently prevent them from undertaking essential functions related to their operations.

174. Based on the foregoing, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**O. Lease Rejection Motion**

175. Pursuant to the Lease Rejection Motion, the Debtors seek authority to (a) reject certain executory contracts or unexpired leases (including, without limitation, any and all amendments, modifications, side letters, memoranda of understanding, and document incorporated therein by reference). of non-residential property (collectively, the "Premises"), each effective *nunc pro tunc* as of the Petition Date or such later date when the Debtors turn over such property, as applicable (the "Rejection Date"); and (b) abandon certain equipment, fixtures, furniture, or other personal property (the "Personal Property") that may located at the Premises.

176. Prior to the filing of the chapter 11 cases, the Debtors and their advisors undertook an extensive analysis of the Debtors' existing contracts and unexpired leases. As a result of this ongoing analysis, the Debtors determined, in their business judgment, based on a number of factors, that the Rejected Contracts identified on **Schedule 1** attached to the Lease Rejection Order are unnecessary and burdensome to the Debtors' estates and should be rejected.

177. In particular, the leases included among the Rejected Contracts are no longer being used in connection with the Debtors' business operations, and the Debtors have vacated the majority of the real properties associated with the Rejected Contracts. To the extent the Debtors have not in fact surrendered any property occupied under the Rejected Contracts on or before the applicable Rejection Date, the effective date of the rejection shall be no earlier than the date the Debtors turn over the applicable property. Accordingly, continued performance

under such leases would impose costs and administrative burdens on the Debtors' estates without providing any corresponding benefit.

178. In the ordinary course of business, the Debtors may have accumulated certain assets at the Premises, including any fixtures and equipment. The Debtors believe they have removed or will remove such assets from the Premises by the Rejection Date. However, in the event that certain Personal Property will be unduly burdensome to remove and potentially store, or are of de minimis value and would be more costly to transport and store, such that the Debtors will not realize any economic benefit by removing or retaining the Personal Property, the Debtors request authority to abandon the Personal Property, if any. I understand the Debtors are continuing to review their outstanding executory contracts and unexpired leases and may file additional motions requesting authority to reject the executory contracts and unexpired leases that are no longer needed by the Debtors' estates.

**P. NOL Motion**

179. Pursuant to the NOL Motion, the Debtors seek (a) approval of notification and hearing procedures for certain transfers of, and declarations of worthlessness with respect to their common stock and instruments treated as stock for U.S. federal income tax purposes, including, for the avoidance of doubt, obligations under the Second Lien Term Loan Facility and Third Lien Term Loan Facility, or any Beneficial Ownership therein (any such record or Beneficial Ownership of common stock or such instruments, the "Tax Equity") (the "Procedures"); and (b) directing that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to, common stock in violations of the procedures be null and void *ab initio*.

180. The Debtors currently estimate that, as of December 31, 2025, they had approximately $459 million of federal NOLs, $552 million of state NOLs, and $418 million of 163(j) carryforwards. Importantly, like their Tax Attributes, the Debtors' asset basis is a

valuable attribute that may be limited by the application of section 382 of the IRC. The Debtors believe that there may be a "net unrealized built-in loss" with respect to assets held by the Debtors because they estimate that the aggregate adjusted tax basis of all such assets is greater than their aggregate fair market value, and, as described in more detail below, section 382 of the IRC limits a corporation's ability to utilize its asset basis for depreciation and other deductions after an "ownership change" if the corporation has a "net unrealized built-in loss" at the time of the "ownership change." Further, the Debtors believe they may generate additional Tax Attributes in the 2026 tax year.

181. The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to carry forward certain Tax Attributes to offset future federal and state taxable income or directly offset federal and state tax liability in future years. Such Tax Attributes may also be utilized by the Debtors to offset any federal and state taxable income or federal and state tax liability generated by transactions consummated pursuant to the Plan. Accordingly, the value of the Tax Attributes will inure to the benefit of all the Debtors' stakeholders.

182. Sections 382 and 383 of the IRC limit the amount of federal taxable income and federal tax liability, respectively, that can be offset by a corporation's tax attributes in taxable years (or portions thereof) following an "ownership change." Generally, an "ownership change" occurs through certain transfers of Beneficial Ownership of Tax Equity or certain worthless stock deductions with respect to Beneficial Ownership of Tax Equity. To maximize the use of the Tax Attributes and enhance recoveries for the Debtors' stakeholders, the Debtors seek limited relief that will enable them to closely monitor certain transfers of Beneficial Ownership of Tax Equity and Claims (including the exercise of certain Options with respect to Tax Equity) and certain worthless stock deductions with respect to Beneficial Ownership of Tax Equity so as to

be in a position to act expeditiously to prevent such transfers of or declarations of worthlessness deductions, if necessary, with the purpose of preserving the Tax Attributes. Accordingly, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**Q. Taxes Motion**

183. Pursuant to the Taxes Motion, the Debtors seek authority to remit and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are or become payable during these Chapter 11 Cases.

184. In the ordinary course of business, the Debtors bill, collect, incur, remit, and/or pay income taxes, sales and use taxes, property taxes, franchise taxes, regulatory passthrough taxes and fees, various other taxes and regulatory fees, and other similar obligations (collectively, the "Taxes and Fees") to various federal, state, local, and foreign governmental units, including taxing authorities (each, a "Taxing Authority," and collectively, the "Taxing Authorities"). The Debtors have typically remitted and paid Taxes and Fees through checks and electronic transfers processed through the Debtors' cash management system. From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes and Fees. The Debtors generally use these credits in the ordinary course of business to offset against future Taxes or Fees or have the amount of such credits refunded to the Debtors.

185. I understand that the Debtors' failure to pay the Taxes and Fees could materially and adversely impact the Debtors' business operations in several ways. First, the Taxing Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from their restructuring process. Second, failing to pay Taxes and Fees could potentially subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key persons from

their duties related to the Debtors' restructuring processes in these chapter 11 cases. Third, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' business and estate value. Additionally, I understand that nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code. Moreover, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and these funds may not constitute property of the Debtors' estates.

186. The Debtors estimate that approximately $10,013,000 in the aggregate in Taxes and Fees relating to the prepetition period have accrued and may become due and owing. The following table describes the various categories of Taxes and Fees and the prepetition amounts sought to be paid pursuant to the Taxes Motion:

| **Prepetition Obligations** | **Amount** |
|---|---|
| Income Taxes | $110,000 |
| Sales and Use Taxes | $1,000,000 |
| Property Taxes | $2,500,000 |
| Franchise Taxes | $3,000 |
| Regulatory Passthrough Taxes and Fees | $5,800,000 |
| Other Taxes and Regulatory Fees | $600,000 |
| **Total** | **$10,013,000** |

187. The Debtors incur and are required to pay various federal, state, and local income taxes (collectively, the "Income Taxes") in the jurisdictions where the Debtors operate. The Debtors generally remit Income Taxes on an annual basis. In 2025, the Debtors remitted approximately $220,000 in the aggregate in Income Taxes to the relevant Taxing Authorities. As

of the Petition Date, the Debtors estimate that they have incurred or collected approximately $110,000 in the aggregate in Income Taxes that have not been submitted to the relevant Taxing Authorities.

188. The Debtors incur, collect, and remit local, state, and foreign sales and use taxes on their taxable telecommunications services, equipment sales, managed services, and other ancillary offerings (collectively, the "Sales and Use Taxes"). The Debtors generally remit Sales and Use Taxes on a monthly, quarterly, and annual basis, which are held in trust for the applicable Taxing Authorities. For certain jurisdictions, the Debtors also pay annual true-up payments to reconcile periodic payments with total annual liability. In 2025, the Debtors paid approximately $5,000,000 in the aggregate in Sales and Use Taxes to the Taxing Authorities. As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $1,000,000 in the aggregate in Sales and Use Taxes that have not been submitted to the relevant Taxing Authorities.

189. The Debtors incur, and are required to pay, various property taxes on owned and leased real and personal property, including telecommunications network infrastructure, fiber assets, equipment, office spaces, and other operational assets (collectively, the "Property Taxes"). The Debtors typically remit Property Taxes to the relevant Taxing Authorities on a semi-annual and annual basis. In 2025, the Debtors paid approximately $2,200,000 in the aggregate in Property Taxes. As of the Petition Date, the Debtors estimate that they have incurred approximately $2,500,000 in the aggregate in Property Taxes that has not been submitted to the relevant Taxing Authorities.

190. The Debtors incur, and are required to pay, various state franchise taxes and similar privilege taxes for the right to operate their business in applicable jurisdictions (the "Franchise Taxes"). The Debtors typically remit Franchise Taxes to the relevant Taxing

Authorities on an annual basis. In 2025, the Debtors paid approximately $2,000 in the aggregate in Franchise Taxes. As of the Petition Date, the Debtors estimate that they have incurred approximately $3,000 in the aggregate in Franchise Taxes that has not been submitted to the relevant Taxing Authorities.

191. The Debtors incur, and are required to pay, various local, state, and federal regulatory assessments and surcharges, including, but not limited to, Federal and State Universal Service Fund contributions, emergency 911 fees, and Public Utility Commission regulatory charges (collectively, the "Regulatory Passthrough Taxes and Fees"). The Debtors typically remit Regulatory Passthrough Taxes and Fees to the relevant Taxing Authorities on a monthly, quarterly, semi-annual, and annual basis, as applicable. In 2025, the Debtors paid approximately $23,000,000 in the aggregate in Regulatory Passthrough Taxes and Fees. As of the Petition Date, the Debtors estimate that they have incurred approximately $5,800,000 in the aggregate in Regulatory Passthrough Taxes and Fees that has not been submitted to the relevant Taxing Authorities.

192. The Debtors incur, and are required to pay, miscellaneous local, state, and federal taxes, business license fees, and other regulatory assessments in the ordinary course of operating their business (collectively, the "Other Taxes and Regulatory Fees"). The majority of the Other Taxes and Regulatory Fees are comprised of fees to fund telephone services for those with impaired hearing or fees due to the Federal Communications Commission. The Debtors typically remit Other Taxes and Regulatory Fees to the relevant Taxing Authorities on a monthly and annual basis, as applicable. In 2025, the Debtors paid approximately $3,900,000 in the aggregate in Other Taxes and Regulatory Fees. As of the Petition Date, the Debtors estimate that they have incurred approximately $600,000 in the aggregate in Other Taxes and Regulatory Fees that has not been submitted to the relevant Taxing Authorities.

193. From time to time, the Debtors are subject to audits on account of tax returns and/or tax obligations for prior obligation periods (collectively, the "Audits"). Currently, the Debtors are under Audit by the state of California, the City of Los Angeles, and the City of Sacramento, and are also subject to a pending audit by the state of South Carolina. Out of an abundance of caution, the Debtors seek authority, but not direction, to pay, in accordance with the Approved DIP Budget, Taxes and Fees on account of the Audits as they arise in the ordinary course of the Debtors' business and consistent with past practice, including as a result of any settlements of issues addressed in any Audits. Further, the Debtors may occasionally contest or otherwise be involved in disputes related to certain Taxes and Fees including, but not limited to, landlord tax liability disputes and other IRS disputes (the "Disputed Matters"). Out of an abundance of caution, any amounts owed pursuant to the Disputed Matters are included in the current calculation of estimated amounts owed on account of the Taxes and Fees.

194. In sum, failure to pay the Taxes and Fees would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully consummate the Restructuring Transactions. Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

**R. Utilities Motion**

195. Pursuant to the Utilities Motion, the Debtors seek (i) approval of the Debtors' proposed form of adequate assurance of payment to the Debtors' utility providers, (ii) the establishment of procedures for determining adequate assurance of payment for future Utility Services, and (iii) to prohibit Utility Companies from altering, refusing, or discontinuing service to, or discriminating against the Debtors on account of the commencement of these Chapter 11 Cases or outstanding prepetition invoices.

196. To operate their business in the ordinary course and manage their network and data centers, warehouses, and office locations, the Debtors obtain electricity, gas, and water services (the "Utility Services"), from a number of different utility providers (collectively, the "Utility Providers" and, each individually, a "Utility Provider"). The Debtors pay approximately 12 Utility Providers for Utility Services. Further, pursuant to certain of the Debtors' lease agreements, certain Utility Services are billed directly to the Debtors' corporate landlord and passed through to the Debtors as part of the Debtors' lease payments. Historically, the Debtors have maintained a satisfactory payment history with the Utility Providers and payments have been made on a regular and timely basis. On average, the Debtors spend approximately $220,000 per month for Utility Services, excluding any deposit amounts previously paid to and held by the Utility Providers.

197. Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the success of these chapter 11 cases. The Debtors' business involves providing communications technology services to their customers. The Debtors' operations require electricity to run the network and data center facilities where the Debtors' servers, storage, computing, and networking equipment are managed to provide their customers' data center, internet, and telecommunication services. The Debtors maintain multiple office spaces and warehouses to manage the storage, inventory, and day-to-day operations of the Debtors, which requires electricity, water, and gas, to operate in their respective location. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, which would negatively impact the Debtors' telecommunication services, and therefore revenue, to the detriment of all parties in interest. Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

198. The Debtors intend to pay undisputed postpetition obligations owed to the Utility Providers in a timely manner. The Debtors expect that their cash on hand, plus cash flows from operations and their proposed use of cash collateral and debtor in possession financing will be sufficient to pay postpetition obligations related to Utility Services in the ordinary course of business.

199. To provide the Utility Providers with additional adequate assurance pursuant to section 366 of the Bankruptcy Code, the Debtors propose depositing into an existing segregated account for the benefit of the Utility Providers (the "Adequate Assurance Account") cash in an amount equal to two (2) weeks' cost of Utility Services, calculated using the historical average weekly cost of such services incurred for the twelve (12) months preceding the Petition Date, less any amounts guaranteed pursuant to a letter of credit issued in favor of, or deposit held by, any such Utility Provider that have not been applied to outstanding prepetition amounts (the "Adequate Assurance Deposit"). The Adequate Assurance Deposit will be placed into the Adequate Assurance Account within fourteen (14) business days after the Petition Date and will be held by the Debtors in the Adequate Assurance Account for the benefit of the Utility Providers on the Utility Service List during the pendency of these chapter 11 cases until the earlier of: (i) reconciliation and payment by the Debtors of the Utility Provider's final invoice in accordance with applicable nonbankruptcy law following Debtors' termination of Utility Services from such Utility Provider, (ii) the effective date of any chapter 11 plan confirmed in these chapter 11 cases, or (iii) the consummation of a sale, pursuant to section 363 of the Bankruptcy Code, of all or substantially all the assets of the Debtors. Based on the foregoing, the Debtors estimate the total amount of the Adequate Assurance Deposit will be approximately $92,000.

200. I understand that the Adequate Assurance Deposit, in conjunction with cash on hand, cash flow from operations, and the proposed use of cash collateral and debtor-in-possession financing, demonstrate the Debtors' ability to pay for future Utility Services in the ordinary course of business (collectively, the "Proposed Adequate Assurance") and constitutes sufficient adequate assurance to the Utility Providers.

201. I believe the continued payment for Utilities Services and the Adequate Assurance Deposit are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued Utility Services. I believe that it is in the best interests of the Debtors, their estates, and all other parties in interest in these cases for the Debtors to maintain the Utility Services in the ordinary course of business and provide adequate assurance to ensure uninterrupted service.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 28, 2026

*/s/ Steven Shenker*

Steven Shenker
Chief Restructuring Officer
U.S. TelePacific Holdings Corp.
and its Debtor affiliates