**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>U.S. TELEPACIFIC CORP., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90625 (ARP)<br><br>(Jointly Administered) |
| U.S. TELEPACIFIC CORP., d/b/a TPx Communications,<br><br>Plaintiff,<br><br>v.<br><br>ARISTA NETWORKS, INC.,<br><br>Defendant. | Adv. Pro. No. _______________ |

**ADVERSARY COMPLAINT**

Plaintiff U.S. TelePacific Corp. d/b/a TPx Communications ("TPx" or "Debtor"), a debtor in the above-captioned chapter 11 cases (together with its affiliated debtors, the "Debtors," and such cases, the "Chapter 11 Cases"), by and through undersigned counsel, respectfully brings this adversary proceeding pursuant to 28 U.S.C. § 157; 11 U.S.C. §§ 105(a), 362, and 541; and Rule 7001 of the Federal Rules of Bankruptcy Procedure against Defendant Arista Networks, Inc. ("Arista") arising out of Arista's breach of contract, breach of the implied covenant of good faith

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of the Debtors' federal tax identification numbers, are: U.S. TelePacific Holdings Corp. (0151); Mpower Holding Corporation (N/A); Mpower Communications Corp. (0042); TPx International Holdings Corp. (N/A); U.S. TelePacific Corp. (3876); NextWeb, Inc. (7530); DSCI, LLC (1304); OCiX, Inc. (2715); Arrival Communications, Inc. (2990); TPx Communications Co. (8824); Big City Networks, Inc. (N/A); and ICG ChoiceCom L.P. (N/A). The Debtors' service address is Plaza 7000 North Mopac Expressway, Suite 2080, Austin, TX 78731.

and fair dealing, and violation of the automatic stay in the Chapter 11 Cases. In support of these claims, the Debtor alleges as follows:

**INTRODUCTION**

1. TPx brings this action against Arista for breach of a negotiated software license and support agreement that has governed TPx's receipt of critical software services since 2016 and Arista's related degradation of TPx's estate property. The Arista SD-WAN platform is the technological backbone of TPx's managed networking business and the foundation upon which TPx delivers connectivity services to approximately 13,000 business-customer locations across the United States. Arista's refusal to honor its contractual obligations strikes at TPx's operational core and jeopardizes TPx's efforts to preserve value for its creditors, employees, and customers as part of these Chapter 11 Cases.

2. This dispute is not about new entitlements. Over the last decade, TPx has paid more than $59 million for SD-WAN licenses and associated support from Arista and its predecessors. Most recently, in May 2026, TPx paid Arista approximately $2.3 million—exactly the amounts Arista itself invoiced—for a license conversion fee and three years of software support at the rates expressly negotiated and set forth in a 2021 amendment. Arista accepted those payments. Two weeks later, Arista stripped TPx of substantially all of these Service Entitlements (defined below) it had received for ten years: software updates, security patches, bug fixes, CVE remediations, platform administrative access, account management, and technical engineering support.

3. The consequences are severe and threaten TPx's very survival. Six of TPx's largest customers have already been materially harmed by Arista's support restrictions and are threatening to cancel or have otherwise signaled that the relationship is at risk.

4. Arista's commercial motive is clear: it wants to force TPx to convert to a subscription license model at much higher prices. Its senior leadership stated explicitly that as long as TPx wished to retain its contractual perpetual license rights, "there was no interest from Arista to negotiate." Arista subsequently demanded that TPx pay, at rates vastly in excess of the contract price, for Service Entitlements it has already paid for and is entitled to receive.

5. Arista's position is that TPx must either abandon its contractual perpetual license rights or accept materially degraded support. That is not a position the contract supports. It is commercial coercion and a violation of the automatic stay. TPx seeks injunctive relief compelling Arista to honor its contractual obligations.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of Texas, dated May 24, 2012.

7. The matters set forth herein are core proceedings pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter final orders for matters contained herein.

8. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

9. Plaintiff TPx is a Delaware corporation headquartered in Austin, Texas. TPx is a provider of managed IT services to approximately 13,000 business-customer locations across the United States, employing approximately 575 people.

10. On information and belief, Defendant Arista Networks, Inc. ("Arista") is a Delaware corporation with its principal place of business in Santa Clara, California. Arista is the counterparty to the Service Provider Agreement ("SPA") at issue and the successor-in-interest to

VeloCloud Networks, Inc. ("VeloCloud") by virtue of the following acquisitions: VeloCloud was acquired by VMware, Inc.; VMware was acquired by Broadcom Inc.; and in 2025, Arista acquired the VeloCloud SD-WAN business from Broadcom. Arista is bound by VeloCloud's obligations under all agreements described herein and has acknowledged its successor status in its correspondence and invoicing to TPx.

## FACTUAL BACKGROUND

### A. TPx's Business and Its Customers

11. TPx was founded in 1998 in California as TelePacific Communications. Through organic growth and acquisitions including NextWeb (2010), Tel West Communications (2011), and DSCI (2016), it evolved into a national managed IT services company serving approximately 13,000 business-customer locations—including healthcare providers, financial institutions, legal organizations, retailers, manufacturers, and government entities—across the United States.

12. TPx's four core service categories are (a) managed connectivity and networking, including SD-WAN; (b) cybersecurity; (c) unified communications; and (d) managed infrastructure and IT services. The SD-WAN platform is the foundational layer of TPx's service delivery and the infrastructure upon which its other managed services depend.

13. TPx is operationally profitable. The Chapter 11 Cases involve a capital structure restructuring designed to de-lever TPx's balance sheet and preserve its going-concern value—including its customer relationships and platform integrity—for all stakeholders.

### B. The SD-WAN Platform

14. SD-WAN (or "Software-Defined Wide Area Network") is a networking technology that allows businesses to route their operations through public clouds and SaaS platforms instead of traditional data centers, providing greater flexibility and cost efficiency. In layman's terms,

SD-WAN is a GPS for network data: it analyzes the various pathways data can take and directs the data along the most efficient and safest one.

15. The SD-WAN platform consists of three integrated components: (a) "Edge" appliances (*i.e.*, the physical hardware placed at each customer location); (b) "Gateway" relay points at data centers (*i.e.*, the component that manages and directs network traffic between the edge devices and cloud services); and (c) the "Orchestrator," a cloud-hosted central control platform through which TPx configures, monitors, and manages every customer's network (*i.e.*, the control center). TPx has deployed more than 13,000 Edge devices across its customer base.

16. Because Edges, Gateways, and the Orchestrator must operate on compatible software versions, coordinated software lifecycle management—maintenance releases, bug fixes, security patches, and remediations for common vulnerabilities and exposures ("CVE remediations")—is foundational to platform security and functionality. Restricting this maintenance introduces version fragmentation, interoperability risk, and security vulnerability across thousands of customer deployments simultaneously.

### C. Historical Performance Under the SPA

17. On September 30, 2016, TPx entered into the SPA with VeloCloud. Over the ensuing decade and pursuant to the SPA, TPx paid more than $59 million in total for licenses, conversion fees, and support through three ownership changes (VeloCloud to VMware, VMware to Broadcom, Broadcom to Arista).

18. Software licenses for the Arista/VeloCloud platform are offered in two forms. A subscription license grants the right to use the software for a defined term—typically three years—and expires at the end of that term unless renewed; it includes ongoing software maintenance, updates, and support for the duration of the subscription. A perpetual license, by contrast, grants

the right to use the software indefinitely, without a fixed expiration date. In recent years, tech companies have increasingly shifted toward subscription-based—rather than perpetual—licensing in an effort to increase recurring revenue.

19. The distinction between the two license types relates to the duration and renewal structure of the usage right—not to the scope of software support services. A perpetual licensee who separately purchases a software support agreement is entitled to the same entitlements that a subscription licensee receives as part of its subscription; the entitlement flows from the support agreement, not from the license type itself.

20. TPx holds more than 15,000 perpetual licenses and has paid separately for software support services under the express terms of the parties' agreement.

21. Despite several changes in VeloCloud's ownership, TPx held and received a consistent, integrated bundle of license and support entitlements—maintenance releases, bug fixes, security patches, CVE remediations, lifecycle management, full Orchestrator administrative access (including "superuser" access and the ability to upload software to the platform), operator user management, PCI configuration, portal administration, account management, and technical engineering support (collectively, the "Service Entitlements")—regardless of license status. This course of performance never varied regardless of whether the licenses at issue were subscription licenses or perpetual licenses. In fact, TPx received precisely the same type of support when it converted 2,849 subscription licenses to perpetual licenses in October 2020 and converted 681 subscription licenses to perpetual licenses in 2021. For example, TPx previously had direct access to software updates. TPx also had "superuser" access, which provided it with full control to manage the platform and perform upgrades and otherwise provide high level services to its customers.

22. It was not until 2026—after Arista acquired the VeloCloud business and decided that TPx's perpetual license structure was inconsistent with its subscription-only model—that anyone suggested that "support" for perpetual licensees meant something different from what TPx had received since 2016. Arista has since revoked TPx's access to software updates and removed its "superuser" access—suggesting it was doing so for security reasons—without providing any remediation or alternatives to ensure that TPx's service levels would remain intact. Arista's position—that perpetual licensees are categorically entitled to lesser Service Entitlements than subscription customers—finds no support in the parties' contract, their ten-year course of performance, or the fundamental distinction between a license type and a support agreement.

**D. Amendment No. 2 and the Conversion Framework**

23. On January 29, 2021, TPx and VeloCloud executed Amendment No. 2 to the SPA ("Amendment No. 2"). Under Amendment No. 2 and its Exhibit E, TPx paid $16,166,697 to renew 12,143 Phase 2 Subscription Licenses through December 31, 2025.[2]

24. Section 2.2 of Exhibit E expressly governs what happens at that expiration date: TPx would pay a $500,000 Conversion Fee to convert the licenses to perpetual status, plus "the Support Agreement fees for a three-year term up front based on the Prepaid pricing set forth in Table E-1"—approximately $1.84 million in total for the three-year initial support term.

25. Arista has contended that support pricing is governed by Section 2.3 of Exhibit E, seeking to write Section 2.2 out of the agreement entirely. Section 2.3 provides that "Software support services for the Deployed Edges may be renewed by Service Provider for additional three (3) year periods at the then-current price." This section, however, is plainly inapplicable because it applies to renewals for "additional" three-year periods, not the initial three-year support period.

[2] The SPA was also amended in 2019 ("Amendment No. 1"). The Amendment modified terms of the SPA that are not material to the instant dispute.

This is made clear by Section 12.3 of the SPA, as amended, which distinguishes between "the initial support and services period" and "any subsequent Support Period renewal term(s)." Section 2.2 of Exhibit E clearly applies to the former while Section 2.3 of Exhibit E clearly applies to the latter.

26. Likewise, Exhibit B to the SPA makes clear that it is TPx, not Arista, that has responsibility for providing technical support for its end-user customers, which it can only do through direct access to the platform tools that Arista and its predecessors had previously made available to TPx.

27. Section 2.5 of Amendment No. 2's Exhibit E provides that Arista must support TPx's perpetual licenses for five years after the software reaches "End of Support Life"—defined as when it "is no longer generally supported by VeloCloud." The software is not at EOSL: Arista continues to actively sell and support it to subscription customers.

**E. Arista's Prepetition Efforts to Coerce TPx Into a Subscription Model**

28. In 2024, Broadcom (then VeloCloud's owner) began encouraging customers to transition to a new subscription-based model. TPx, having a contractual right to transition to more cost-effective perpetual licenses, refused to do so. Broadcom responded by reducing TPx's longstanding hardware discount from 45 percent to 30 percent. Eventually, Broadcom backed down and honored its end of the bargain.

29. During this period, TPx and Broadcom separately entered into a Regional Partner Agreement that governed the future purchase of hardware; the existing perpetual and subscription licenses remained governed by the original Master Service Agreement and its amendments. Broadcom itself assured TPx that "[e]xisting active subscriptions transacted under a legacy MSA will remain in effect and will continue to be governed by the terms of such MSA," and that "[t]here

will be no changes to the terms of the existing MSA."

30. Arista acquired VeloCloud from Broadcom in mid-2025, and it escalated Broadcom's previous campaign to pressure TPx into forfeiting its contractual rights and accepting a subscription-based license.

31. Following Arista's representation that it would repudiate the SPA, Arista claimed that the Regional Partner Agreement, which applied only to future purchases, superseded the parties' decade-long SPA. After TPx explained why Arista's position made no sense, Arista reversed course, arguing in January 2026 that the SPA *was* the operative agreement and that it required TPx to pay 17 times more for the same exact support it had received for a decade—over $31 million versus the contractually prescribed $1.84 million.

32. At a February 27, 2026 meeting between the parties, Arista informed TPx that as long as TPx wished to retain its perpetual license rights, "there was no interest from Arista to negotiate." TPx's only option, in Arista's view, was to purchase subscriptions at rates vastly in excess of the contract price. Following this conversation, Arista's counsel provided a subscription quote of approximately ***$46 million*** for a three-year term. This is effectively the price for a new subscription customer, not a perpetual license holder who already had paid for support. On April 9, 2026, TPx countered at the Table E-1 contractual rate. Arista rejected this as a "non-starter."

33. On May 6, 2026, Arista sent TPx a letter demanding payment of the $2.34 million referenced above and stating its position that perpetual licenses do not entitle TPx to software upgrades. During the week of May 11, 2026, TPx paid Arista $500,000 for the conversion fee and approximately $1.8 million for software support—both amounts at the rates Arista itself invoiced under Section 2.2 and Table E-1. TPx has paid all amounts properly owed under the contract.

34. In late May 2026—notwithstanding that TPx had just paid in full the amounts Arista

itself had invoiced and demanded—Arista made sweeping changes to TPx's platform access, including eliminating TPx's "superuser" access and proactive access to software updates, and eliminating account management and technical sales-engineering support. These actions eliminated or severely curtailed (a) proactive access to software updates, patches, and CVE remediations (now requiring exclusively ticket-by-ticket Arista approval); (b) user management; (c) software version assignment at the customer level; (d) PCI configuration capability; (e) portal administration; and (f) account management and technical sales engineering support. Each was a Service Entitlement that TPx had held, and paid for, continuously for a decade.

**F. Arista's Postpetition Conduct**

35. As of the Petition Date, TPx retained, among other things: administrative control over operator user management; the ability to assign operator profiles at the customer level (which ensures that newly activated devices receive the correct software version); the ability to enable and disable PCI configuration settings (which TPx's technicians use to run remote diagnostics, packet captures, and related troubleshooting); the ability to administer customer-facing portal banner messaging; access to the hosted Orchestrator; and their fully paid three-year rights under the Support Agreement.

36. On or about July 20, 2026—three weeks after the Petition Date—Arista issued a "Notice of Security Update – User Roles Change" and implemented a further round of access restrictions (the "User Roles Change"). The notice states that Arista determined that the "Operator Superuser role will be reserved for Arista Administrators only" and that, "[t]o apply this change, all of the Operator Superusers are being changed to Operator Standard Administrators."

37. As a result of the User Roles Change, TPx can no longer manage operator users, assign operator profiles at the customer level, or configure PCI settings, and can no longer

administer portal banner messaging. Each of those capabilities existed on the Petition Date. Arista provided no advance notice. Its account manager later characterized the changes as standard security "hygiene" applicable across Arista's customer base.

38. The practical effect is that newly provisioned devices inherit the wrong software versions, TPx cannot run the diagnostics they use to support customers, and routine employee onboarding and offboarding now depend on Arista. Arista's restrictions have also impaired TPx's internal audit and compliance functions. Because TPx can no longer view access permissions, it now depends on Arista to provide lists of users with access to the Orchestrator.

39. On July 23, 2026, Arista escalated further by unilaterally refusing to provide a software version necessary to resolve an active customer issue. TPx stabilized service through a partial downgrade at a subset of the customer's sites—mitigation that is temporary at best. Arista had signaled its position before the Petition Date—in its May 6, 2026 letter and in June 2026 support-case responses referring questions of software entitlement and access to new software versions to legal channels—but its postpetition refusals applied that position to deny specific requests in active customer emergencies. According to Arista, software upgrades would be approved only "as a last resort" after exhausting all other alternatives—including downgrading, reconfiguring, and workarounds.

40. On July 27, 2026, Arista's account manager confirmed this new policy in writing, stating that "[s]oftware upgrades for perpetual licenses are available only if they are the only way to solve an issue." The only alternatives Arista offered were to "downgrade to the software version originally used" or "change the customer configuration." In the same email, the account manager invoked Arista's prepetition May 6 letter as the source of the policy—an invocation that confirms both that the denial was a deliberate act of policy enforcement and that the policy's basis is the

perpetual character of TPx's licenses, not security and not any failure of payment.

41. On July 29, 2026, Arista's account manager confirmed that the restriction of software upgrades is tied to "Arista's perpetual license policy" and that TPx receives no account management or technical sales resources because it does not participate in a program that would include them.

42. The before-and-after impact is summarized in the following table:

| Service Entitlement | 2016–Q1 2026 (Historical) | Current |
|---|---|---|
| TAC (technical assistance) support | Yes | Yes |
| Software maintenance releases | Yes | Limited / restricted |
| Bug-fix releases | Yes | Limited: only if no workaround exists per Arista |
| Security patches and CVE remediation | Yes | Limited / requires ticket approval |
| Software lifecycle management | Yes | Limited |
| Administrative capabilities (user mgmt, PCI config, portal, provisioning) | Yes | Limited / Arista-controlled |
| Account management support | Yes | Eliminated |
| Sales engineering / technical sales support | Yes | Eliminated |

43. Arista's postpetition conduct is inflicting new, discrete, and escalating harm on the estates virtually every week, through two reinforcing mechanisms. First, Arista has continued to withhold paid-for maintenance, leaving TPx powerless to remediate customer outages and defects because, in multiple instances, the corrective software exists but Arista will not release it. Second, Arista has affirmatively performed intrusive maintenance on TPx's customer networks. For instance, following a security incident in Arista's own environment on or about July 27, 2026, customer Edge certificate upgrades became necessary—upgrades that, because of Arista's access

revocations, only Arista could perform. Through late July and August 2026, Arista scheduled and executed those service-impacting upgrades on its own timetable, with insufficient notice and during business-critical hours, causing out-of-service conditions at several of TPx's customers—disruptions TPx historically prevented by controlling maintenance scheduling, technical preparation, and customer communications. One customer has had multiple locations out of service where the fix exists in firmware Arista will not release; another suffered an outage across 110 locations; a third has had sites repeatedly taken out of service; a fourth suffered a full enterprise outage and was forced to revert to firmware vulnerable to future disruption; and at least one of TPx's largest customers has threatened to cancel over security and end-of-life upgrades that Arista acknowledges exist but will not provide.

44. As of August 2026, six of TPx's largest customers—representing combined monthly recurring revenue exceeding $714,000 (over $8,500,000 in annual revenue)—have been materially harmed and are threatening to cancel or have otherwise signaled the relationship is at risk. These customer harms are directly traceable to Arista's refusal to permit TPx access to firmware versions needed to resolve known bugs and to remediate disruptions caused by Arista's own platform maintenance activity. TPx's second-largest customer, who accounts for $203,000 in monthly recurring revenue, was denied a firmware upgrade to fix a bug during an active contract negotiation. Two other large customers suffered outages at dozens of locations from Arista maintenance that TPx cannot remediate. One customer has explicitly threatened to cancel, and another has stated that "the trust has been lost."

45. Arista has made the price of restoration explicit. TPx may recover the Service Entitlements it has already bought only by purchasing subscription licenses at approximately $46 million over three years and surrendering the perpetual licenses the estates own. TPx has

demanded that Arista restore its access and honor the Service Entitlements provided for in the SPA, as amended by Amendment No. 2. Arista has refused, and its degradation of TPx's platform rights continues as of the filing of this adversary proceeding.

46. The harm to TPx's customer relationships and business reputation cannot be remedied by money damages alone. Customers who cancel do not return. In the context of TPx's Chapter 11 Cases, each customer departure directly reduces the going-concern value that the restructuring is designed to preserve for creditors and other stakeholders. Additionally, even if such damages could be calculated, they are precluded by the express terms of the SPA, which does not permit indirect, special, incidental, or consequential damages. Simply put, Arista's sustained refusal to honor its contractual obligations has caused the situation to deteriorate materially from July into August 2026, leaving TPx exposed to severe and mounting operational risk, monetary damages, and irreparable harm, including, but not limited to, deteriorating customer goodwill and key partnerships, mounting reputational harm, and increasing risk of depleted going-concern value.

47. TPx is not the only party at risk by Arista's ongoing breach. Each day Arista fails to provide TPx with the Service Entitlements—depriving TPx's 13,000 business-customer locations of ready support and effective remediation—exposes TPx's customers, their networks, and data to significant and potentially irreparable security risks. The consequences of those potential security vulnerabilities cannot be reliably predicted, quantified, or reduced to a damages calculation: a security incident could disrupt customer operations, compromise sensitive information, or cause other harms that cannot simply be undone through a later monetary award. The resulting harm to TPx is similarly incapable of adequate compensation.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**

48. TPx incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

49. The SPA, as amended by Amendment No. 2 and Exhibit E, is a valid, binding, and enforceable contract between TPx and Arista as successor-in-interest to VeloCloud. TPx has fully performed all obligations, including paying the $500,000 Conversion Fee and approximately $1.84 million in Table E-1 support fees in full.

50. Arista has breached the contract by (a) refusing to provide software maintenance releases, bug fixes, security patches, CVE remediations, and software lifecycle management; (b) stripping TPx of platform administrative capabilities necessary to operate a managed services platform; (c) conditioning software updates on case-by-case Arista approval not authorized by the contract; (d) eliminating account management and technical sales engineering support; and (e) demanding payment at rates vastly in excess of those specified in the contract as a precondition to restoring the Service Entitlements.

51. As a direct and proximate result, TPx has suffered and continues to suffer damages, including reputational damage, impairment of going-concern value, lost customer revenue, and costs of mitigation, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

52. TPx incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

53. Arista has breached the implied covenant of good faith and fair dealing by engaging in a deliberate course of conduct designed to frustrate the purpose of the parties' agreement and

deprive TPx of the benefits it bargained for. Immediately after accepting approximately $2.3 million in May 2026 for the license conversion and software support, Arista stripped TPx of the Service Entitlements those payments were intended to secure. Furthermore, Arista converted the routine software maintenance TPx had received for over a decade into a discretionary approval process designed to make perpetual license ownership operationally untenable. At all times, Arista retained lawful means to address any genuine security or operational concern while preserving the value of the Service Entitlements; it refused to pursue them or to engage with TPx at all.

54. Arista also engaged in bad faith by leveraging TPx's platform dependence and its customers' reliance to coerce concessions not authorized by the contract; conditioning any negotiation on TPx abandoning its contractual perpetual license rights; and explicitly stating it has "no interest in negotiating" as long as TPx retains those rights.

55. As a direct and proximate result, TPx has suffered and continues to suffer damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE AUTOMATIC STAY IMPOSED BY 11 U.S.C. § 362(a)

56. TPx incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

57. Arista's postpetition acts violate 11 U.S.C. § 362(a)(3), which stays "any act to obtain possession of the property of the estate or of property from the estate or to exercise control over property of the estate."

58. Arista's postpetition conduct—a series of new, affirmative acts—each degrades the estates' property from the Petition Date. First, the July 20 User Roles Change was a paradigmatic affirmative act. On the Petition Date, TPx managed its own operator users, assigned operator

profiles, controlled PCI settings, and administered customer banners. Three weeks later, Arista stripped those abilities from TPx.

59. Second, Arista's new "last resort" approval regime—first applied postpetition on July 23, stated in writing on July 27, and confirmed by Arista's account manager on July 29—interposes Arista's case-by-case discretion between the estates and the maintenance the estates have already bought. Converting a paid-for contractual entitlement into a dispensation that Arista may grant or withhold is an exercise of dominion and control over estate property. And each successive postpetition refusal to release a paid-for fix is a new, discrete affirmative act.

60. Further, Arista was not merely withholding when its own late-July security incident required certificate upgrades across TPx's customer edges—upgrades that, after the access revocations, only Arista could perform. Arista itself scheduled and executed that maintenance postpetition, on its own terms and timetable, disrupting service at TPx's customers. A creditor that seizes operational control of the platform a debtor uses to serve its customers, and then exercises that control postpetition, "exercise[s] control over property of the estate" in the most literal sense. 11 U.S.C. § 362(a)(3).

61. Third, Arista's measured, escalating postpetition squeeze of TPx consists of steps taken in furtherance of extinguishing the estates' perpetual license rights.

62. Arista's violations are willful, intentional, and deliberate. Arista has actual knowledge of the Chapter 11 Cases as it has appeared through counsel, filed the Cure Objection, and submitted a declaration of its general counsel in support thereof. *See* Docket No. 195-1. Moreover, on July 15, 2026—before the User Roles Change and each of the postpetition refusals described above—TPx's litigation counsel warned Arista's counsel in writing that section 362(a)(3) stays "any act . . . to exercise control over property of the estate," that TPx's contract

rights are property of the estate under section 541(a), and that a counterparty's withholding of deliverables or other interference with those rights exercises control over estate property. Arista's responded by escalating its conduct: sending the July 20 User Roles Change, refusing technical assistance by TPx's customer on July 23, and issuing the July 27 written policy statement—all within twelve days of that warning.

**PRAYER FOR RELIEF**

WHEREFORE, TPx prays for relief as follows:

1. A preliminary injunction requiring Arista to immediately restore the Service Entitlements, as described herein. TPx has no adequate remedy at law. The balance of equities favors TPx.

2. A permanent injunction requiring Arista to perform such services and provide such access for the duration of the contract term;

3. Specific performance of such services and access for the duration of the contract term;

4. A declaration resolving (a) whether Section 2.2 of Exhibit E or Section 2.3's "then-current price" governs the initial post-conversion support term; (b) whether the Service Entitlements include software maintenance, bug fixes, security patches, CVE remediations, lifecycle management, and platform administrative access; (c) whether Arista may condition software updates on case-by-case approval; (d) whether TPx's May 2026 payments satisfy its obligations for the initial three-year support term; and (e) whether Arista may declare EOSL while actively supporting the software for other customers.

5. For civil contempt under section 105(a);

6. For actual damages, including costs, attorneys' fees, and punitive damages under 11 U.S.C. § 362(k)(1);

7. For costs of the proceedings herein;

8. For attorneys' fees as provided by statute and by agreement; and

9. For such other and further relief as the Court deems just and proper

Dated: August 28, 2026
Houston, Texas

/s/ *Chelsea McManus*
**SIDLEY AUSTIN LLP**
Duston K. McFaul (24003309)
Chelsea McManus (24131499)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
Email: dmcfaul@sidley.com
cmcmanus@sidley.com

and

Stephen E. Hessler (admitted *pro hac vice*)
Anthony R. Grossi (admitted *pro hac vice*)
Weiru Fang (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: shessler@sidley.com
agrossi@sidley.com
weiru.fang@sidley.com

and

Jason L. Hufendick (admitted *pro hac vice*)
Ryan Fink (admitted *pro hac vice*)
Daniela Rakowski (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Email: jhufendick@sidley.com
ryan.fink@sidley.com
drakowski@sidley.com

*Attorneys for the Debtors*
*and Debtors in Possession*