**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>U.S. TELEPACIFIC CORP., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90625 (ARP)<br><br>(Jointly Administered) |

# DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER COMPELLING MEDIATION

**Emergency relief has been requested. Relief is requested not later than 11:00 A.M. (prevailing Central Time) on September 2, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on September 2, 2026 at 11:00 A.M. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, TX 77002.**

**Participation at the hearing will be permitted in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's home page. The meeting code is "JudgePerez." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Pérez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification numbers, are: U.S. TelePacific Holdings Corp. (0151); Mpower Holding Corporation (N/A); Mpower Communications Corp. (0042); TPx International Holdings Corp. (N/A); U.S. TelePacific Corp. (3876); NextWeb, Inc. (7530); DSCI, LLC (1304); OCiX, Inc. (2715); Arrival Communications, Inc. (2990); TPx Communications Co. (8824); Big City Networks, Inc. (N/A); and ICG ChoiceCom L.P. (N/A). The Debtors' service address is Plaza 7000 North Mopac Expressway, Suite 2080, Austin, TX 78731.

U.S. TelePacific Corp. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" or "TPx")[2] in the above-captioned chapter 11 cases, hereby submit this motion (the "Motion"), together with the *Declaration of David Zahn in Support of the Arista Mediation Motion* (the "Zahn Declaration"), filed contemporaneously herewith, and state as follows in support thereof:

## Relief Requested

1. The Debtors seek entry of a proposed order substantially in the form attached hereto (the "Order"): (i) appointing a to be determined mediator (the "Mediator"); (ii) authorizing and directing the Debtors and Arista Networks, Inc. ("Arista") (each a "Mediation Party", and collectively, the "Mediation Parties") to mediate the Mediation Topics (as defined below) as soon as possible following entry of the Order, subject to the availability of the Mediator; (iii) directing the Mediation Parties to meet and confer in an effort to submit an agreed-upon order and stipulation setting forth the terms of the mediation; and (iv) granting related relief.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of Texas, dated May 24, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent to the Court's entry of a final order to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan (as defined below).

orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101—1532 (the "Bankruptcy Code"), rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures").

## PRELIMINARY STATEMENT

5. On August 28, 2026, the Debtors initiated an adversary proceeding against Arista pursuant to rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), alleging, among other things, breaches of contract, breach of the implied covenant of good faith and fair dealing, violations of the automatic stay, and seeking injunctive and declaratory relief (the "Adversary Proceeding").

6. In the interim, the Debtors seek entry of the Order authorizing and compelling the Mediation Parties to mediate (i) the claims, counterclaims, and defenses asserted or assertable in the Adversary Proceeding; (ii) the scope of the Service Entitlements (as defined below) to which the Debtors are entitled under the Arista Agreements (as defined below)—including software maintenance releases, bug fixes, security patches, CVE remediations, and software upgrades in respect of the Debtors' perpetual licenses—and the restoration of degraded Service Entitlements, including the Debtors' platform access and administrative capabilities; (iii) the Cure Objection (as defined below), any cure amounts, and the proposed assumption of the Arista Agreements; (iv) the terms of the Mediation Parties' go-forward commercial and support relationship; and (v) any other claims or disputes between the Mediation Parties arising from or relating to the Arista Agreements

(collectively, the "Mediation Topics") in order to avoid protracted litigation and related expenses on the Debtors' estates. Prior to the filing of this Motion, the Debtors conferred with counsel to Arista regarding Arista's consent to the relief requested herein. As of the filing of this Motion, the Debtors have not received a response with respect to such consent, affirmative or negative.

## BACKGROUND

### A. The Chapter 11 Cases and the Debtors' Business.

7. On June 28, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases. The Debtors continue to operate their businesses and manage their properties as debtors in possession. The Debtors have filed the *Amended Joint Chapter 11 Plan of U.S. TelePacific Corp. and Its Debtor Affiliates* [Docket No. 279] (the "Plan") and the *Disclosure Statement for the Amended Joint Chapter 11 Plan of U.S. TelePacific Corp. and Its Debtor Affiliates* [Docket No. 280], which are set for a combined confirmation hearing before the Court on September 2, 2026 at 11:00 a.m. (prevailing Central Time) to effectuate a fully committed recapitalization transaction with the Debtors' existing lenders and equity holder.

8. TPx provides managed information-technology services to approximately 13,000 business customer locations nationwide. A foundational layer of that business is TPx's managed SD-WAN offering, which runs on the VeloCloud software platform now owned by Arista—a networking company that, among other things, provides equipment and software to direct internet traffic. Zahn Declaration ¶ 5.

9. The SD-WAN platform is software that guides network data through the fastest available connections; it is, in essence, a GPS for network data. *Id.* ¶ 6. The platform consists of three integrated components: (a) "Edge" appliances deployed at customer locations (TPx has deployed more than 13,000 Edge devices); (b) "Gateway" SD-WAN end points at TPx data

centers; and (c) a cloud-hosted "Orchestrator" through which TPx configures, monitors, and supports every customer network. *Id.* Because Edges, Gateways, and the Orchestrator must run compatible software versions, coordinated software maintenance, including maintenance releases, bug fixes, security patches, and CVE remediations, is essential to the security and functionality of the platform and to TPx's ability to serve its customers. *Id.* If the software is not updated consistently throughout the platform, the SD-WAN service will degrade or cease to perform reliably. *Id.*

**B. The Arista Agreements and the Estates' Paid-For Property Rights.**

10. On September 30, 2016, Debtor U.S. TelePacific Corp. entered into a Service Provider Agreement (as amended, the "SPA") with VeloCloud Networks, Inc. Arista is the successor-in-interest to VeloCloud (via VMware, Inc. and Broadcom Inc.) and has acknowledged its successor status under the SPA, its amendments, a 2021 term sheet, and a 2025 Regional Partner Agreement (collectively, the "Arista Agreements"). *See Arista Networks, Inc.'s Objection to Debtors' Notices of (A) Potential Executory Contracts and Unexpired Leases to be Potentially Assumed, (B) Cure Amounts, if Any, and (C) Related Procedures in Connection Therewith* [Docket No. 195] (the "Cure Objection") ¶ 1. Over the past decade, the Debtors have paid more than $59 million under the Arista Agreements for licenses, conversion fees, and support. Zahn Declaration ¶ 7. Throughout that period—across three changes of platform ownership—TPx received a consistent, integrated bundle of license and support entitlements, which included software maintenance releases, bug fixes, security patches, CVE (Common Vulnerabilities and Exposures) remediations, software lifecycle management, full administrative access to the hosted Orchestrator (including "superuser" access and the ability to upload software to the platform), and account-management and technical sales-engineering resources (collectively, the "Service Entitlements"). *Id.* ¶ 8. That scope did not vary based on whether the underlying licenses were

subscription or perpetual. *Id.* TPx converted an earlier tranche of licenses to perpetual status and continued to receive the same Service Entitlements. The nature of these entitlements was the same from the time VeloCloud was a standalone company. *Id.*

11. Under Amendment No. 2 to the SPA (effective January 29, 2021) and its Exhibit E, TPx's 12,143 subscription licenses converted to perpetual licenses on December 31, 2025, conditioned on payment of (a) a conversion fee capped at $500,000 and (b) "Support Agreement fees for a three-year term up front" at the prepaid pricing fixed in Table E-1 of Exhibit E—approximately $1.84 million for the three-year term (the "Support Agreement"). *See* Amendment No. 2, Ex. E §§ 2.2–2.3; Zahn Declaration ¶ 9 & Ex. B.

12. In January 2026, Arista issued invoices for the $500,000 conversion fee and for the Support Agreement fees. Zahn Declaration ¶ 10. During the week of May 11, 2026, TPx paid Arista approximately $2.34 million—days after receiving a May 6, 2026 demand letter described below—which equaled the $500,000 conversion fee plus the three-year prepaid Support Agreement fees. *Id.* These were amounts Arista itself invoiced. *Id.* Arista accepted, and retains, those payments. *Id.*

**C. Arista's Prepetition Pressure Campaign.**

13. Beginning in 2024, Arista's predecessor began pressuring the Debtors to surrender their perpetual licenses in favor of far more expensive subscriptive licenses, including by reducing the Debtors' hardware discount from 45 percent to 30 percent, and Arista escalated that campaign after acquiring the VeloCloud business. Zahn Declaration ¶ 11. At a February 27, 2026 meeting, Arista's senior leadership made clear that Arista would not negotiate the parties' disputes unless the Debtors abandoned their perpetual license rights, and that the Debtors' only path forward, in Arista's view, was to purchase subscription licenses—which Arista thereafter quoted at approximately $46 million over a three-year term. Arista's representatives stated that, as long as

the Debtors wished to retain their perpetual license rights, "there was no interest from Arista to negotiate." *Id.* ¶ 11. The Debtors countered on April 9, 2026 at the contractual Table E-1 rates; Arista rejected that proposal. *Id.*

14. On May 6, 2026, Arista sent the Debtors a letter demanding payment of the $2.34 million referenced above and stating its position that perpetual licenses do not entitle the Debtors to software upgrades (the "May 6 Letter"). Zahn Declaration ¶ 12 & Ex. E. In late May 2026—notwithstanding that TPx had just paid in full the amounts Arista had invoiced and demanded—Arista made sweeping changes to TPx's platform access including removing the "superuser" access TPx had held for approximately ten years, eliminating TPx's proactive access to software updates, and eliminating TPx's ability to upload software to the platform, including on customer edge devices. *Id.* Separately in late May 2026, Arista also eliminated TPx's account management and technical sales-engineering support. Arista suggested the access changes were for security reasons, but it provided no remediation or alternatives to ensure that TPx's service levels and administrative capabilities would remain intact. *See id*.

**D. Arista's Postpetition Conduct.**

15. As of the Petition Date, TPx retained, among other things: administrative control over operator user management; the ability to assign operator profiles at the customer level (which ensures that newly activated devices receive the correct software version); the ability to enable and disable PCI (Payment Card Industry) configuration settings (which TPx technicians use to run remote diagnostic bundles, packet captures, and related troubleshooting); the ability to administer customer-facing portal banner messaging; access to the hosted Orchestrator; and TPx's fully paid three-year rights under the prepaid Support Agreement. *Id.* ¶ 14.

16. On July 20, 2026—three weeks after the Petition Date—Arista issued a "Notice of Security Update – User Roles Change" and implemented a further round of access restrictions.

Zahn Declaration ¶ 16 & Ex. H. The notice states that Arista determined that the "Operator Superuser role will be reserved for Arista Administrators only" and that, "[t]o apply this change, all of the Operator Superusers are being changed to Operator Standard Administrators." Zahn Declaration ¶ 16 & Ex. H. As a result of the change, the Debtors can no longer manage operator users, assign operator profiles at the customer level, or configure PCI settings, or administer portal banner messaging. *Id.* ¶ 16. Each of those capabilities existed on the Petition Date. *See id.* ¶¶ 14, 16. The practical effect is that newly provisioned devices inherit the wrong software versions, the Debtors cannot run the diagnostics they use to support customers, and routine employee onboarding and offboarding now depend on Arista. *Id.* ¶ 16.

17. On July 23, 2026, Arista's technical assistance center refused to provide the software version needed to resolve an active issue for the Debtors' second-largest customer as measured by monthly recurring revenue. Zahn Declaration ¶ 17. The Debtors stabilized service through a partial downgrade at a subset of the customer's sites, a mitigation that is temporary at best. *Id.*

18. On July 27, 2026, Arista's account manager applied that policy in writing to deny a pending request in an active support case concerning a Debtor customer, saying that "[s]oftware upgrades for perpetual licenses are available only if they are the only way to solve an issue." *Id.* ¶ 18. The only alternatives Arista offered were to "downgrade to the software version originally used" or "change the customer configuration." *Id.* On July 29, 2026, the account manager further confirmed to the Debtors that (a) the upgrade restrictions are tied to Arista's perpetual license policy and (b) the Debtors receive no account management or technical sales

resources because TPx does not participate in a program that would include them. Zahn Declaration ¶ 19.

19. Arista's conduct is inflicting discrete and escalating harm on the estates virtually every week, through two reinforcing mechanisms. First, Arista has continued to withhold paid-for maintenance, leaving the Debtors powerless to remediate customer outages and defects because, in multiple instances, the corrective software exists but Arista will not release it. *See* Zahn Declaration ¶¶ 17, 21. Second, Arista has affirmatively performed intrusive maintenance on the Debtors' customer networks. Following a security incident in Arista's own environment on or about July 27, 2026, customer edge certificate upgrades became necessary—upgrades that, because of Arista's access revocations, only Arista could perform. *Id.* ¶ 20. Through late July and August 2026, Arista scheduled and executed those service-impacting upgrades on its own timetable, with insufficient notice and during business-critical hours, causing out-of-service conditions at several of the Debtors' customers—disruptions the Debtors historically prevented by controlling maintenance scheduling, technical preparation, and customer communications. *Id.* Among the examples detailed in the Zahn Declaration, each involving a major customer of the Debtors: one customer has had multiple locations out of service where the fix exists in firmware Arista will not release; another suffered an outage across 110 locations; a third has had sites repeatedly taken out of service; a fourth suffered a full enterprise outage and was forced to revert to firmware vulnerable to future disruption; and at least one of the Debtors' largest customers has threatened to cancel over security and end-of-life upgrades that Arista acknowledges exist but will not provide. *Id.* ¶ 21. In the aggregate, six of the Debtors' largest customers—together representing more than $714,000 in combined monthly recurring revenue (over $8,500,000 in

annual revenue)—have been harmed or have signaled that their relationships with the Debtors may be at risk. *Id.* ¶ 21.

20. Arista has made the price of restoration explicit. The Debtors may recover the Service Entitlements they have already bought only by purchasing subscription licenses at approximately $46 million over three years and surrendering the perpetual licenses the estates own. *Id.* ¶ 24. The Debtors have demanded that Arista restore their access and honor the prepaid Support Agreement. *Id.* Arista has refused, and its degradation of the Debtors' platform rights continues as of the filing of this Motion. *See id.*

## BASIS FOR RELIEF

21. This Court has the authority to appoint a mediator and direct parties to mediation pursuant to the Complex Case Procedures and section 105 of the Bankruptcy Code. The Complex Case Procedures state "[t]he Court may order mediation of any dispute arising in an adversary proceeding, contested matter or otherwise." Complex Case Procedures ¶ 48.

22. Likewise, section 105 of the Bankruptcy Code provides that this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a); *see also In re A.T. Reynolds & Sons, Inc.*, 424 B.R. 76, 85 (Bankr. S.D.N.Y. 2010) ("While it goes without saying that a court may not order a party to settle, this Court has authority to order the parties to participate in the process of mediation, which entails discussion and risk analysis."), *rev'd on other grounds*, 452 B.R. 374 (S.D.N.Y. 2011). Further, section 105 is regularly invoked by bankruptcy courts to order parties to mediate disputed matters even if all of the relevant parties did not consent to such mediation. *See In re Acme Cake Co., Inc.*, 495 B.R. 212, 219 (Bankr. E.D.N.Y. 2010) (recognizing that "this Court had the authority to direct the parties to mediation" even if the parties did not consent to such mediation order); *see also Bruno v. Mona Lisa at Celebration, LLC (In re Mona Lisa at Celebration, LLC)*, 410 B.R. 710,

716-17 (Bankr. M.D. Fla. 2009) (ordering mediation under section 105(a) where "both judicial economy and common sense dictate[d] that the parties, or if needed, the Court resolve [the matter] in an organized and unified manner"). Courts have increasingly relied on mediation to streamline cases, narrow issues, and reduce the costs of litigation which, in many cases, can become quite burdensome on the parties and the judicial system.

23. The proposed mediation will facilitate the prompt and cost-effective resolution of the Mediation Topics and will minimize this Court's administrative burden in connection with a potentially costly and lengthy adversary proceeding process. Absent a consensual resolution of the Mediation Topics, the Adversary Proceeding process will proceed, the costs of which would ultimately be borne by the creditors of these bankruptcy estates. Thus, the Debtors believe that the best path forward is to commence mediation as soon as possible and attempt to reach a consensual path forward on the Mediation Topics. In the alternative, should Arista agree to revert its performance under the Arista Agreements to the state that existed prior to the May 2026 changes—including restoring the Debtors' platform access and administrative capabilities, as well as fully honoring the Service Entitlements —during the pendency of the Adversary Proceeding, mediation would be unnecessary as reversion would prevent further irreparable harm to the Debtors.

**Emergency Consideration**

24. Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion. Arista's conduct is inflicting new harm on the Debtors' estates every week. Six of the Debtors' largest customers—together representing more than $714,000 in combined monthly recurring revenue (over $8,500,000 in annual revenue)—have been harmed or have signaled that their relationships with the Debtors are at risk, and the Debtors

cannot timely remediate customer outages because Arista withholds corrective software the Debtors have already paid for. Zahn Declaration ¶¶ 17–22. Each customer lost to these disruptions is unlikely to return, and customer attrition, lost goodwill, and reputational damage of this kind are irreparable and directly erode the going-concern value the Debtors are working to preserve in these chapter 11 cases. *Id.* ¶¶ 21, 23. Timing compounds the urgency as the combined confirmation hearing is set for September 2, 2026, and the parties' disputes, including the proposed assumption of the Arista Agreements and the Debtors' entitlements thereunder, bear directly on the Debtors' emergence from these cases. A mediation commenced promptly can resolve those disputes consensually and comprehensively before litigation costs mount in the Adversary Proceeding and customer harm compounds. Accordingly, the Debtors respectfully request that the Court hear this Motion at the earliest available setting and approve the relief requested herein on an emergency basis.

## **NOTICE**

25. Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) Arista and its counsel; (b) the Office of the United States Trustee; (c) counsel to the Ad Hoc Group; (d) counsel to the Committee; (e) the United States Attorney's Office for the Southern District of Texas; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors request that the Court enter the Order, substantially in the form attached hereto, granting the relief requested herein and granting such other relief as is just and proper.

Dated: August 29, 2026
Houston, Texas

*/s/ Chelsea McManus*
**SIDLEY AUSTIN LLP**
Duston K. McFaul (24003309)
Chelsea McManus (24131499)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
Email: dmcfaul@sidley.com
cmcmanus@sidley.com
*and*

Stephen E. Hessler (admitted *pro hac vice*)
Anthony R. Grossi (admitted *pro hac vice*)
Weiru Fang (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: shessler@sidley.com
agrossi@sidley.com
weiru.fang@sidley.com
*and*

Jason L. Hufendick (admitted *pro hac vice*)
Ryan Fink (admitted *pro hac vice*)
Daniela Rakowski (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: jhufendick@sidley.com
ryan.fink@sidley.com
drakowski@sidley.com

*Attorneys for the Debtors*
*and Debtors in Possession*

**Certificate of Service**

I certify that on August 29, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Chelsea McManus*
Chelsea McManus

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>U.S. TELEPACIFIC CORP., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90625 (ARP)<br><br>(Jointly Administered) |

**ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER COMPELLING MEDIATION**

(Related to Docket No. __)

Upon the motion (the "Motion")[2] of U.S. TelePacific Corp. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") directing the Mediation Parties to participate in mediation regarding the Mediation Topics; and this Court having jurisdiction over this matter in accordance with 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of Texas, dated May 24, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is permissible pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and opportunity for a hearing on the Motion having been given; and the relief requested in the Motion being in the best interests of the Debtors' estates, their

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification numbers, are: U.S. TelePacific Holdings Corp. (0151); Mpower Holding Corporation (N/A); Mpower Communications Corp. (0042); TPx International Holdings Corp. (N/A); U.S. TelePacific Corp. (3876); NextWeb, Inc. (7530); DSCI, LLC (1304); OCiX, Inc. (2715); Arrival Communications, Inc. (2990); TPx Communications Co. (8824); Big City Networks, Inc. (N/A); and ICG ChoiceCom L.P. (N/A). The Debtors' service address is Plaza 7000 North Mopac Expressway, Suite 2080, Austin, TX 78731.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

creditors and other parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is GRANTED as set forth herein.

2. The Mediator is authorized to serve as mediator in accordance with this Order. The mediation parties shall include the Debtors and Arista (each, a "Mediation Party", and collectively, the "Mediation Parties").

3. The Mediator is authorized to mediate disputes between the Mediation Parties with respect to the following matters: (a) the claims, counterclaims, and defenses asserted or assertable in the Adversary Proceeding; (b) the scope of the Service Entitlements to which the Debtors are entitled under the Arista Agreements—including software maintenance releases, bug fixes, security patches, CVE remediations, and software upgrades in respect of the Debtors' perpetual licenses—and the restoration of degraded Service Entitlements, including the Debtors' platform access and administrative capabilities; (c) the Cure Objection, any cure amounts, and the proposed assumption of the Arista Agreements; (d) the terms of the Mediation Parties' go-forward commercial and support relationship; and (e) any other claims or disputes between the Mediation Parties arising from or relating to the Arista Agreements.

4. The Mediation Parties, by and through their advisors, shall promptly meet and confer in good faith to establish procedures for the Mediation, including the filing of mediation briefs. Notwithstanding the Complex Case Procedures, but so long as not inconsistent with the terms of this Order, the Mediator may conduct the Mediation as the Mediator determines appropriate, establish rules of the Mediation, and consider and take appropriate action with respect to any matters the Mediator deems appropriate to conduct the Mediation.

5. The Mediation Parties shall attend and participate in the mediated sessions with at least one principal or other individual with authority to make decisions binding upon such Mediation Party (such individual may include attorneys and other advisors to each Mediation Party, at such Mediation Party's sole discretion). The Mediation shall be held in person at a location, date, and time to be agreed upon by the Mediation Parties, subject to the Mediator's availability. Each Mediation Party shall submit a mediation brief to the Mediator in support of their position with respect to the Mediation Topics, in accordance with the procedures established by the Mediation Parties and the Mediator.

6. The Mediation shall be governed by the Complex Case Procedures. Without limiting the applicability of the Complex Case Procedures, all communications from any Mediation Party or the Mediator that are prepared, submitted, or made (whether in writing or verbally) to any Mediation Party or the Mediator in connection with the Mediation, including, without limitation, (a) discussions among any of the Mediation Parties in connection with the Mediation, including discussions with or in the presence of the Mediator; (b) mediation statements and any other documents or information provided to the Mediator or Mediation Parties in connection with the Mediation; and (c) all correspondence, settlement proposals, counterproposals, term sheets, and other offers of compromise produced for, as a result of, or in connection with the Mediation (collectively, the "Settlement Proposals") shall be strictly confidential and shall remain confidential; and the materials described in each of the foregoing clauses (a) through (c) (the "Mediation Information"): (1) shall be protected from disclosure (and shall not be disclosed) to any other person or party who is not a participant in the Mediation, and/or to any court or any governmental agency, absent the express consent of the Mediation Party whose Mediation Information is being shared (provided that any Mediation Party may share Mediation

Information provided by them without seeking consent of any other Mediation Party); (2) shall not constitute a waiver of any existing privileges and immunities; (3) shall not be used for any purpose other than the Mediation; (4) shall not be admissible for any purpose in any judicial or administrative proceeding; (5) shall be subject to protection under Rule 408 of the Federal Rules of Evidence and any equivalent or comparable state law; and (6) in the case of Settlement Proposals not accepted in connection with the Mediation, shall not constitute material nonpublic information following the conclusion of the Mediation except to the extent that they contain material nonpublic information separate and apart from the fact that a Mediation Party was prepared to agree to the terms set forth therein.

7. If any Mediation Party is in possession of privileged or confidential documents and/or information provided to such Mediation Party pursuant to the terms and conditions of a confidentiality agreement or a Court order entered in connection with these chapter 11 cases, such information may be disclosed to the Mediator but shall otherwise remain privileged and confidential and shall not be disclosed to any other Mediation Party, subject to the terms of such confidentiality agreement or Court order, each as applicable. Any Mediation Party may provide documents and/or information to the Mediator that are subject to a privilege or other protection from discovery, including the attorney-client privilege, the work-product doctrine, or any other privilege, right, or immunity such parties may be entitled to claim or invoke (the "Privileged Information"). Privileged Information that is provided solely to the Mediator and not to any other Mediation Party or person shall not serve as the disclosing party's or its respective professional's intent to waive or shall be deemed to waive, in whole or in part, the attorney-client privilege, the work-product doctrine, or any other privilege, right, or immunity that such disclosing party or its

respective professional may be entitled to claim or invoke with respect to any Privileged Information or otherwise.

8. Any work product, materials, or information that a Mediation Party shares with or produces to the Mediator in connection with the Mediation, including Privileged Information, shall be subject to all applicable mediation privileges, and the Mediator shall not share any such work product, materials, or information with any other Mediation Party without the consent of the sharing or producing Mediation Party.

9. No Mediation Party shall, as a result of participating in the Mediation conducted pursuant to this Order or being aware or in possession of any Settlement Proposal, (a) be or become an insider, a temporary insider, or fiduciary of any other party; (b) be deemed to owe any duty to any other party; (c) undertake any duty to any party in interest; or (d) be deemed to misappropriate any information of any other party that has designated any material as confidential or highly confidential under an order entered in these cases; *provided*, *however*, that nothing herein shall affect any Mediation Party's pre-existing fiduciary obligations.

10. No discovery may be taken in connection with the conduct of the Mediation, unless consented to by the applicable Mediation Party.

11. The Mediator shall file with this Court a memorandum promptly after the conclusion of the Mediation stating (a) that the Mediator has conducted the Mediation; (b) the names of the Mediation Parties, including counsel, advisors, and principals, who participated in the Mediation; (c) whether the Mediator believes that the Mediation Parties participated in good faith; and (d) whether and to what extent the Mediation was successful, and, if the Mediation Parties agree, the terms of such settlements and agreements. Notwithstanding anything to the contrary herein and subject only to (a)-(d) in the preceding sentence, the Mediator

may not disclose to the Court any Mediation Information, nor may the Mediator have any involvement, in any capacity, in the potential litigation and/or any other litigation proceedings, or investigations that relate to or concern the Mediation Information.

12. The Mediator shall not be compelled, nor shall be permitted, to testify or disclose any information concerning the Mediation in any forum or proceeding except as provided in (a)-(d) in the preceding paragraph.

13. The Mediation shall be deemed to have commenced upon entry of this Order. The Mediator shall be immune from claims arising out of acts or omissions incident to the Mediator's service in the Mediation or in these chapter 11 cases.

14. Nothing contained herein shall be construed as a waiver of any Mediation Parties' rights, claims, or defenses.

15. The limited relief set forth herein shall not be construed as an admission by any party of liability regarding any claim or cause of action arising from or in relation to the Mediation Topics or any other matter.

16. This Order shall not be modified, altered, amended, or vacated without the written consent of all Mediation Parties or by further order of the Court.

17. Good and sufficient notice of the relief provided for in this Order has been provided, and the requirements of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules are satisfied.

18. Notwithstanding the applicability of any Bankruptcy Rule to the contrary, the terms and provisions of this Order shall immediately be effective and enforceable upon the date of this Order.

19. Upon the entry of this Order, the Mediation Parties are authorized to take all actions necessary to effectuate the relief provided in this Order.

20. This Order shall be binding on and inure to the benefit of the Mediation Parties and their respective heirs, executors, administrators, successors, and permitted assigns.

21. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Houston, Texas
Dated: ____________, 2026

______________________________________
UNITED STATES BANKRUPTCY JUDGE